Jacob A. Schroeder (SBN 264717)
 jacob.schroeder@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,**
 **GARRETT & DUNNER, LLP**
3300 Hillview Avenue
Palo Alto, CA 94304-1203
Telephone:    (650) 849-6600
Facsimile:    (650) 849-6666

Daniel C. Cooley (*pro hac vice*)
 daniel.cooley@finnegan.com
Daniel M. Jordan (*pro hac vice*)
 dan.jordan@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,**
 **GARRETT & DUNNER, LLP**
1875 Explorer Street, 8th Floor
Reston, VA 20190-6023
Telephone:    (571) 203-2700
Facsimile:    (571) 203-2777

Andrea G. Mills (*pro hac vice*)
 gracie.mills@finnegan.com
**FINNEGAN, HENDERSON, FARABOW,**
 **GARRETT & DUNNER, LLP**
901 New York Avenue, NW
Washington, DC 20001-4413
Telephone:    (202) 408-4000
Facsimile:    (202) 408-4400

*Attorneys for Defendants*
*Motorola Mobility LLC and*
*Lenovo (United States) Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| HEADWATER RESEARCH LLC, | Case No. 4:23-cv-04496-JST |
| Plaintiff, | |
| v. | **DEFENDANTS MOTOROLA MOBILITY LLC AND LENOVO (UNITED STATES) INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)** |
| MOTOROLA MOBILITY LLC AND LENOVO (UNITED STATES) INC., | |
| Defendants. | Date:      Thursday, April 18, 2024<br>Time:      2:00 p.m.<br>Location:  Courtroom 6, 2nd Floor<br>Judge:     Hon. Jon S. Tigar |

# <u>TABLE OF CONTENTS</u>

**Page**

NOTICE OF MOTION AND MOTION ....................................................................................1

STATEMENT OF RELIEF REQUESTED ...............................................................................1

STATEMENT OF ISSUES TO BE DECIDED ........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................1

I.      INTRODUCTION ...........................................................................................................1

II.     LEGAL STANDARD .....................................................................................................2

III.    RELEVANT BACKGROUND FACTS ..........................................................................4

       A.     The '076 Patent ....................................................................................................6

       B.     The '700 Patent ....................................................................................................6

IV.    ARGUMENT ...................................................................................................................7

       A.     The '076 Patent Is Ineligible Under 35 U.S.C. § 101 ..........................................7

              1.     *Alice* Step One: Claim 1 Is Directed to an Abstract Idea ..........................7

                   a.     Claim 1 Is Directed to Screening Requests....................................8

                   b.     Screening Requests Is an Abstract Idea .........................................9

              2.     *Alice* Step Two: Claim 1 Includes No Inventive Concept ........................16

              3.     The Dependent Claims Are Likewise Ineligible........................................18

       B.     The '700 Patent Is Ineligible Under 35 U.S.C. § 101 ..........................................19

              1.     *Alice* Step One: Claim 1 Is Directed to an Abstract Idea ..........................19

                   a.     Claim 1 Is Directed to Scheduling Activities ...............................19

                   b.     Scheduling Activities Is an Abstract Idea .....................................20

              2.     *Alice* Step Two: The Claims Include No Inventive Concept....................23

               3.     The Dependent Claims Are Likewise Ineligible........................................24

V.     CONCLUSION..............................................................................................................25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*24/7 Customer, Inc. v. LivePerson, Inc.*,
  No. 15-cv-02897-JST, 2017 U.S. Dist. LEXIS 81479 (N.D. Cal.
  May 25, 2017) ..................................................................................................18, 22, 24

5

6

*Alice Corp. v. CLS Bank International*,
  573 U.S. 208 (2014) ....................................................................................................2, 3

7

8

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016) ......................................................................................2

9

10

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
  915 F.3d 743 (Fed. Cir. 2019) ........................................................................................3

11

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*,
  687 F.3d 1266 (Fed. Cir. 2012) ....................................................................................14

12

13

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ...............................................................................4, 16

14

15

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ........................................................................................................3

16

*Broadcom Corp. v. Netflix Inc.*,
  No. 3:20-cv-04677-JD, 2021 U.S. Dist. LEXIS 174678 (N.D. Cal.
  Sept. 14, 2021) ..................................................................................................4, 15, 18

17

18

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018) ....................................................................................16

19

20

*CardioNet, LLC v. InfoBionic, Inc.*,
  955 F.3d 1358 (Fed. Cir. 2020) ......................................................................................2

21

22

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) ........................................................................................3

23

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ...............................................................................19, 24

24

25

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ....................................................................................12

26

27

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ............................................................................ *passim*

28

ii

*Enfish, LLC v. Microsoft Corp.*,
 822 F.3d 1327 (Fed. Cir. 2016)...............................................................................3, 15

*Ericsson Inc. v. TCL Commc'n Techs. Holdings Ltd.*,
 955 F.3d 1317 (Fed. Cir. 2020)..............................................................2, 11, 12, 21, 22

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
 879 F.3d 1299 (Fed. Cir. 2018)...............................................................................3

*Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*,
 50 F.4th 1371 (Fed. Cir. 2022) ...........................................................................17, 24

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
 850 F.3d 1332 (Fed. Cir. 2017)...............................................................................13

*Intell. Ventures I LLC v. Symantec Corp.*,
 838 F.3d 1307 (Fed. Cir. 2016)...........................................................................3, 22

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
 942 F.3d 1143 (Fed. Cir. 2019)...........................................................................15, 25

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
 566 U.S. 66 (2012)...............................................................................3

*Mortg. Application Techs., LLC v. MeridianLink, Inc.*,
 839 F. App'x 520 (Fed. Cir. 2021) ...............................................................................21

*PlanetID, LLC v. Digify, Inc.*,
 No. 19-cv-04615-JST, 2021 U.S. Dist. LEXIS 30213 (N.D. Cal.
 Jan. 12, 2021)...........................................................................4, 17, 21

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
 696 F. App'x 1014 (Fed. Cir. 2017) ...............................................................................12

*RingCentral, Inc. v. Dialpad, Inc.*,
 372 F. Supp. 3d 988 (N.D. Cal. 2019) ...............................................................................22

*SAP Am., Inc. v. InvestPic, LLC*,
 898 F.3d 1161 (Fed. Cir. 2018)...............................................................................2

*Simio, LLC v. FlexSim Software Prods., Inc.*,
 983 F.3d 1353 (Fed. Cir. 2020)...............................................................................17

*Smart Sys. Innovations, LLC v. Chi. Transit Auth.*,
 873 F.3d 1364 (Fed. Cir. 2017)...............................................................................12

*Smartflash LLC v. Apple Inc.*,
 680 F. App'x 977 (Fed. Cir. 2017) ...............................................................................12

*TDE Petrol. Data Sols., Inc. v. AKM Enter., Inc.*,
 657 F. App'x 991 (Fed. Cir. 2016) ...............................................................................22

*In re TLI Commc'ns LLC Pat. Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) ......................................................................... *passim*

*Trinity Info Media, LLC v. Covalent, Inc.*,
    72 F.4th 1355 (Fed. Cir. 2023) ...............................................................................17

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) .................................................................................3

**Statutes**

35 U.S.C. § 101 ............................................................................................. *passim*

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................................................1, 17

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on Thursday, April 18, 2024, at 2:00 p.m., in Courtroom 6 of the United States District Court for the Northern District of California, Oakland Division, 1301 Clay Street, Oakland, California 94612, Defendants Motorola Mobility LLC ("Motorola") and Lenovo (United States) Inc. ("Lenovo US") will move this Court for an order dismissing Counts 1–2 of the Complaint (ECF No. 1) filed by Headwater Research LLC ("Headwater").

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is warranted because Headwater's asserted patents (U.S. Patent Nos. 9,198,076 and 10,749,700) are invalid as a matter of law because they are directed to patent-ineligible subject matter pursuant to 35 U.S.C. § 101.

This motion is based upon the following Memorandum of Points and Authorities, the filings in this action, and any such additional material or argument as may be submitted to the Court before its decision.

## STATEMENT OF RELIEF REQUESTED

Defendants respectfully request that the Court dismiss Counts 1–2 of the Complaint with prejudice under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## STATEMENT OF ISSUES TO BE DECIDED

Whether the claims of the asserted patents are ineligible for patenting under 35 U.S.C. § 101.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The claims of the asserted patents are ineligible for patenting under 35 U.S.C. § 101 because they are directed to abstract ideas and fail to recite any inventive concepts. U.S. Patent No. 9,198,076 ("the '076 Patent")[1] claims a wireless device configured to "classify" an "Internet access request," then "allow or disallow" it based on that classification and a "power control state." Put more succinctly, the '076 Patent's claims are directed to screening requests. Sharing a common

---

[1] Ex. 1 to ECF No. 1.

1  disclosure, U.S. Patent No. 10,749,700 ("the '700 Patent")[2] claims a related concept of

2  "associat[ing]" network access policy controls with executable applications and then "schedul[ing]"

3  execution times for those applications. In other words, the '700 Patent claims the concept of

4  scheduling activities. Both screening requests and scheduling activities are mental processes

5  routinely carried out by people in gatekeeping roles, such as assistants who screen requests and

6  schedule meetings for an executive. Merely implementing these ideas in an Internet context does not

7  render them patent eligible. Rather, these processes are examples of "controlling access to resources

8  by receiving a request and determining if the request for access should be granted"—something the

9  Federal Circuit has held is abstract. *Ericsson Inc. v. TCL Commc'n Techs. Holdings Ltd.*, 955 F.3d

10 1317, 1325–27 (Fed. Cir. 2020). Plaintiff has not pled any factual allegations for either patent that

11 support an inventive concept; nor could it, as the asserted patents admit that the wireless end-user

12 devices that perform these processes are conventional. This Court should dismiss the Complaint with

13 prejudice.

14 **II.    LEGAL STANDARD**

15     Patent eligibility under 35 U.S.C. § 101 "is a question of law" that "may be, and frequently

16 has been, resolved on a Rule 12(b)(6) . . . motion where the undisputed facts, considered under the

17 standards required by that Rule, require a holding of ineligibility under the substantive standards of

18 law." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (collecting cases).

19     To determine whether a patent claims an abstract concept, courts engage in the two-step

20 inquiry set forth in *Alice Corp. v. CLS Bank International*, 573 U.S. 208, 217–18 (2014). First,

21 courts determine whether the claims at issue are "directed to" an abstract idea. *Id.* at 217. "[S]tep one

22 presents a legal question" only, which "does not require an evaluation of the prior art or facts outside

23 of the intrinsic record." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372, 1374 (Fed. Cir.

24 2020). This analysis often begins "with an examination of eligible and ineligible claims of a similar

25 nature from past cases." *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1295 (Fed. Cir.

26 2016). To determine whether this exception applies, courts evaluate at step one "whether the claims

27

28

---

[2] Ex. 2 to ECF No. 1.

at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 573 U.S. at 218. This inquiry has also been described as "looking at the 'focus' of the claims." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)). "In cases involving software innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting *Enfish*, 822 F.3d at 1335–36). While the specification may be "helpful in illuminating what a claim is 'directed to,'" "the specification must always yield to the claim language" when identifying the "true focus of a claim." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019) (citation omitted).

If the claims are directed to an abstract idea, the inquiry proceeds to step two. At step two, the court determines whether the claim elements, individually or collectively, add "significantly more" to the abstract idea—something "inventive"—that is "sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 217–22 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 72–73, 79 (2012)); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1322 (Fed. Cir. 2016) (any inventive concept must be "in the claims," not in unclaimed "technological details set forth in the patent's specification"). "Stating an abstract idea 'while adding the words "apply it"' is not enough for patent eligibility. Nor is limiting the use of an abstract idea 'to a particular technological environment.'" *Alice*, 573 U.S. at 223 (first quoting *Mayo*, 566 U.S. at 72; and then quoting *Bilski v. Kappos*, 561 U.S. 593, 610–11 (2010)). Nor can claims simply recite "generic functional language to achieve [the] purported solutions" without claiming "*how* the desired result is achieved." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017) (citation omitted).

Whether an asserted patent is invalid for failure to satisfy § 101 "is a question of law based on underlying facts that may be resolved on a Rule 12(b)(6) motion when the undisputed facts require a holding of ineligibility." *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 749 (Fed. Cir. 2019) (internal citations omitted). While the step two inventiveness inquiry

1    may occasionally involve "underlying issues of fact," *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365

2    (Fed. Cir. 2018), a factual dispute arises only if the claims themselves capture the alleged

3    inventiveness or are directed to an allegedly inventive concept contained in the specification, *id.* at

4    1369–70; *see also PlanetID, LLC v. Digify, Inc.*, No. 19-cv-04615-JST, 2021 U.S. Dist. LEXIS

5    30213, at *5–6 (N.D. Cal. Jan. 12, 2021) (Tigar, J.) (conventionality of claim elements may be

6    answered adversely to the patentee based on the sources available on a motion to dismiss);

7    *Broadcom Corp. v. Netflix Inc.*, No. 3:20-cv-04677-JD, 2021 U.S. Dist. LEXIS 174678, at *11–12

8    (N.D. Cal. Sept. 14, 2021) ("To be sure, a patentee cannot avoid dismissal for ineligible claims

9    purely on the basis of conclusory or generalized statements . . . .").

10   ## III.    RELEVANT BACKGROUND FACTS

11          Headwater filed this case against Lenovo US and Motorola, asserting the '076 Patent entitled

12   "Wireless End-User Device with Power-Control-State-Based Wireless Network Access Policy for

13   Background Applications," and the '700 Patent entitled "Device-Assisted Services for Protecting

14   Network Capacity." Both asserted patents are part of a web of related patents and applications. By

15   way of example, the '076 Patent purports to claim priority to more than 40 continuation and

16   provisional applications. '076 Patent at Related U.S. Application Data. Headwater has asserted

17   several of these related patents in eight presently active cases against Samsung, AT&T, Verizon, and

18   T-Mobile. Each of those cases was filed in the Eastern District of Texas. This is the only Headwater

19   case filed in the Northern District of California and the only case asserting the '076 and '700 Patents.

20          According to the '076 and '700 Patents, the resources of many wireless networks are

21   stretched thin. "The increasing popularity of various smart phone devices, net book devices, tablet

22   computing devices," and others is leading to a "network capacity crunch." *Id.* at 3:28–37. Network

23   resources, e.g., base stations, are inundated with requests for access to the network, leading to

24   "flooding" or "overloading" of the base stations. *Id.* at 6:19–67. When this happens, the base station

25   becomes "overwhelmed" by the requests and may begin "fall[ing] behind" in servicing the requests.

26   *Id.* at 6:56–67. The '076 and '700 Patents purport to improve the efficiency of network usage by

27   screening and scheduling requests to access the network.

28

DEFENDANTS' MOTION TO DISMISS
CASE No. 4:23-cv-04496-JST

1    The asserted patents acknowledge that a device's requests to access the network may vary in

2    several ways. First, they may vary in their priority. Typically, each request is associated with an

3    application at a device. *Id.* at 4:6–21. Because the services provided by these applications vary, the

4    priority of requests may vary. As one example, a service that is "interactive," such as an application

5    that is interacting with a user in a user interface "foreground," may be higher priority because it

6    requires "reasonably low response time" for a request, while a service occurring in the background

7    may be "lowest priority." *Id.* at 16:35–44, 101:16–39, 105:59-62. For other services, it may make

8    sense to hold off sending requests until a "scheduled transmission time." *Id.* at 86:44–55.

9    Requests may also vary in their likelihood to lead to repeated requests for network access. As

10   one example, a device may permit an application to access the network and then later interrupt the

11   access due to the device's "power save algorithm." *Id.* at 7:57–62. As a result, "each time the device

12   enters [the] power save state and then exits [the] power save state[,] network resources are

13   consumed." *Id.* at 7:42–57. This happens frequently if the device employs "an aggressive power save

14   algorithm that enters [the] power save state after a short idle period." *Id.* at 7:50–62; *see also id.* at

15   93:31–42.

16   Purporting to address such issues, the asserted patents disclose a device that—akin to an

17   assistant intercepting, prioritizing, and relaying communications to an executive—intercepts requests

18   by applications to launch or access the network. *See id.* at 6:19–67, 11:15–37, 65:12–28. The device

19   handles requests differently based on priority, likelihood to lead to repeated requests, or other

20   classifications, as set forth in a "control policy." *Id.* at 11:46–49, 12:38–46. In the '076 Patent, for

21   example, the device intercepts a network access request between the application and base station.

22   The device classifies the intercepted request based on its priority, then screens the request if it is both

23   lower priority and likely to lead to repeated requests. In the '700 Patent, the disclosed device

24   associates policy controls with applications at the device. Then, when an application issues a request

25   to execute an activity, the device intercepts the request and schedules a time for execution of that

26   activity, according to the policy controls.

27

28

5

## A.    The '076 Patent

The '076 Patent is directed to screening requests, claiming a wireless device configured to "classify" an "Internet access request," and then "allow[ing] or disallow[ing]" it based on that classification and a "power control state." *Id.* at 105:50–106:11. In the '076 Patent, "[a] wireless end-user device has a wireless wide-area network (WWAN) modem." *Id.* at Abstract. "One or more processors classify whether an application associated with an Internet access request is interacting with a user." *Id.* "In at least one power control state, the Internet access request is disallowed because the application is classified as not interacting with a user." *Id.* "In at least one other power control state, a similar Internet access request is allowed." *Id.* Claim 1 is the sole independent claim of the '076 Patent. In full, claim 1 recites:

1. A wireless end-user device, comprising:

a wireless wide area network (WWAN) modem to communicate data for Internet service activities between the device and at least one WWAN, when configured for and connected to the at least one WWAN; and

one or more processors configured to, for a time when data communication for Internet service activities is provided by the WWAN modem and the at least one WWAN,

classify whether a first end-user application associated with an Internet access request, and capable of both interacting with a user in a user interface foreground of the device, and at least some Internet service activities when not interacting with a user in the device user interface foreground, is interacting with the user in the device user interface foreground, and

allow or disallow the Internet access request based on the classification as to whether the first end-user application is interacting with the user and based on a power control state, such that when the power control state is a first power control state and the first end-user application is classified as not interacting with the user, the Internet access request is disallowed, and when the power control state is at least one other power control state, the Internet access request is allowed.

*Id.* at 105:50–106:11.

## B.    The '700 Patent

The '700 Patent is directed to scheduling activities, claiming "associat[ing]" network access policy controls with executable applications, and then "schedul[ing]" execution times for those applications. '700 Patent at 107:33–52. In the '700 Patent, "before a given device application . . . or

1    other service activity is allowed to start, the intention to start is intercepted by a launch manager," a

2    "network protection service policy set for the service activity is retrieved, and any necessary . . .

3    service launch policies are implemented prior to allowing the service activity to launch." *Id.* at

4    66:38–45. In some cases, the launch manager "delay[s] launch" by the application. *Id.* at 66:45–54.

5    Claim 1 is the lone independent claim of the '700 Patent, which recites:

6              1. A wireless end user device comprising:

7              at least one wireless modem to provide network access for the wireless
               end user device;
8
               an activity classifier to, for each of a plurality of executable
9              applications stored on the wireless end-user device, dynamically
               associate one or more corresponding network access policy controls
10             with each of the plurality of executable applications;

11             an Application Programming Interface (API) accessible to each of the
               plurality of executable applications, the API callable by each of the
12             executable applications to request an execution time according to the
               corresponding network access policy controls for that application; and
13
               a launch manager to schedule corresponding execution times for
14             applications requesting an execution time through the API, the launch
               manager selecting corresponding execution times, for the applications
15             requesting execution time, according to the respective network access
               policy controls for each such application.
16
     *Id.* at 107:33–52.

17
     **IV.    ARGUMENT**
18
             Each of the asserted patents is ineligible under § 101. The claims are directed to the abstract
19
     ideas of screening requests and scheduling activities according to rules, both of which are activities
20
     humans routinely perform. The claims recite only generic components to carry out these abstract
21
     ideas and are devoid of any allegedly inventive concept. Plaintiff has not pled any particular
22
     inventiveness or unconventionality—nor could it, as both the claims and the specifications of the
23
     asserted patents make clear they are ineligible.
24
             **A.    The '076 Patent Is Ineligible Under 35 U.S.C. § 101**
25
                     **1.    *Alice* Step One: Claim 1 Is Directed to an Abstract Idea**
26
             Claim 1 of the '076 Patent is directed to screening a request through two steps. First, the
27
     request is classified based on whether a user is interacting with the requesting application—which,
28
     as explained below, merely indicates whether the request is higher priority or lower priority. Second,

1    the request is screened based on that classification and a "power control state"—which, as explained

2    below, merely indicates whether the request is likely to lead to repeated requests. These same two

3    steps—classifying a request based on its priority, then screening the request based on that

4    classification and its likelihood to lead to repeated requests—are routinely performed by humans in

5    gatekeeper functions and are, accordingly, abstract.

6              **a.     Claim 1 Is Directed to Screening Requests**

7              The two-step process for screening requests is apparent from the language of the claims. The

8    "one or more processors" in claim 1 are "configured to" do two things: "classify" an "Internet access

9    request," then "allow or disallow" it based on that classification and a "power control state." '076

10   Patent at 105:50–106:11.

11             The claimed classifying amounts to classifying the request as higher priority or lower

12   priority. As the claim recites, the processor(s) "classify" the request by determining "whether a first

13   end-user application associated with an Internet access request . . . is interacting with the user in the

14   device user interface foreground." *Id.* at 105:55–67. An Internet access request from an application

15   that the user is interacting with in the foreground of the device is higher priority because the user is

16   awaiting the Internet access requested. An Internet access request from an application that the user is

17   not interacting with is lower priority because the user is not waiting. *Id.*

18             The claimed allowing or disallowing amounts to screening out requests that are both lower

19   priority and likely to lead to repeated requests. As the claim recites, the processor(s) "allow or

20   disallow the Internet access request based on the classification" as well as a "power control state."

21   *Id.* at 106:1–11. The classification, as just explained, indicates whether the request is higher priority

22   or lower priority. The power control state indicates whether the request is likely to lead to repeated

23   requests. As the '076 Patent explains, "when an application . . . attempts to connect to the network

24   . . . when the modem [of the device] is in a power save state . . . , it can cause the modem to change

25   [the] power save state, reconnect to the network, and then initiate the application network

26   connection." *Id.* at 93:31–38. Indeed, "each time the device enters [the] power save state and then

27   exits [the] power save state[,] network resources are consumed." *Id.* at 7:50–57. If the device

28   employs "an aggressive power save algorithm that enters [the] power save state after a short idle

1  period," repeated requests for network access occur, causing the device to "consume a proportionally

2  large amount of resources." *Id.* at 7:50–62. Disallowing an Internet access request made when the

3  device is in a power save state avoids awakening the device from its power save state, thereby

4  avoiding such repeated, and resource-consuming, requests. *See also id.* at 93:31–42. Thus, the claim

5  recites screening out requests that are both lower priority (as indicated by the classification) and

6  likely to lead to repeated requests (as indicated by the power control state).

7  **b.    Screening Requests Is an Abstract Idea**

8          Classifying a request as higher priority or lower priority, then screening requests that are both

9  lower priority and likely to lead to repeated requests, is an abstract idea. This idea has long been

10  performed by humans in gatekeeping functions, like executive assistants. Imagine, for example, an

11  executive that, like the base station in the '076 Patent, is in danger of being "overload[ed]" with

12  requests for access. *Id.* at 6:19–67. To avoid being "overload[ed]," *id.*, the executive employs an

13  assistant that, like the processor(s) in the '076 Patent, screens these requests. This is shown in

14  Figure 4A of the '076 Patent, which is annotated here (in red) to illustrate the analogy. As shown,

15  the base station (which is overloaded with requests for access) is likened to the executive. The

16  application (which requests access to the base station) is likened to a person requesting access to the

17  executive. And the processor (which screens the requests for access to the network) is likened to the

18  executive's assistant, who screens requests for access to the executive.



*Id.* at Fig. 4A (annotations added).

1       People requesting access to the executive make a request through the executive's assistant,

2 just as the claimed "application[s]" request access to the base station (and thus, the Internet) through

3 the "processor[s]." The executive's assistant decides how to handle the requests from the people, just

4 as the claimed "processor[s]" decide how to handle requests from the "application[s]." Some

5 requests are passed along to the executive, just as the "processor[s]" "allow" some requests. And

6 some requests are screened, just as the "processor[s]" "disallow" some requests.

7       In particular, in the same way the claimed "processor[s]" classify the applications' requests

8 as higher priority or lower priority (by considering whether the application "is interacting with the

9 user"), the assistant routinely classifies the people's requests for the executive's time as higher

10 priority or lower priority. For instance, the assistant may classify as higher priority an email

11 requiring an immediate answer, while the assistant may classify a more general email as lower

12 priority.

13       As explained above, the "processor[s]" consider the "power control state" of the device to

14 assess whether a request is likely to lead to repeated requests. An executive assistant likewise

15 considers whether a request is likely to lead to repeated requests. For example, the assistant may

16 distinguish between a short email seeking a yes/no response (that is unlikely to lead to repeated

17 requests) and a vendor email selling a new service (that is likely to lead to repeated requests).

18       Finally, the executive assistant routinely allows or disallows requests based on each of the

19 classification as higher priority or lower priority and the likelihood to lead to repeated requests. In

20 particular, just as the claimed "processor[s]" disallow a request that is lower priority ("not

21 interacting with the user") and likely to lead to repeated requests ("first power control state"), the

22 executive assistant screens lower priority requests that are likely to lead to repeated requests (e.g., an

23 email from a vendor selling a new service). And in the same way the "processor[s]" allow a request

24 that is unlikely to lead to repeated requests, the executive assistant passes along a request that is

25 unlikely to lead to repeated requests (e.g., a short email seeking a yes/no response) regardless of its

26 priority. As shown below, the language of claim 1 maps to this common human activity.

27

28

| Claim Language | Human Activity |
|---|---|
| "**classify** whether a first end-user application associated with an Internet access request, . . . is interacting with the user in the device user interface foreground, and" | **classify** whether a person's request for an executive's time is higher priority |
| "**allow or disallow** the Internet access request based on the classification . . . and based on a power control state, such that | **pass along or screen** the request based on the classification and how likely it is to lead to repeated requests, such that |
| when the power control state is a first power control state and the first end-user application is classified as not interacting with the user, the Internet access request is disallowed, and | when the request is lower priority and likely to lead to repeated requests, it is screened, and |
| when the power control state is at least one other power control state, the Internet access request is allowed." | when the request is not likely to lead to repeated requests, it is passed along to the executive. |

This decision-making process is a commonplace gatekeeper function completed in the assistant's mind. The assistant must "classify" in his or her mind the priority (indicated by "interacting with the user") of the request, consider if repeated requests for the executive's time will follow (indicated by the "power control state"), and then "allow" or "disallow" the request based on these mental steps. The Federal Circuit has "treated analyzing information by steps people go through in their minds . . . , without more, as essentially mental processes within the abstract-idea category." *Elec. Power*, 830 F.3d at 1354.

Unsurprisingly, similar steps have been deemed abstract in other cases. In *Ericsson*, for example, the Federal Circuit considered a claim to a "system for controlling access" by "application[s]" at a "mobile phone[]." 955 F.3d at 1325–26 (citation omitted). The system included

"an interception module" that "receiv[ed] a request" from the application and "a decision entity" that "determin[ed] if the request should be granted." *Id.* (citation omitted). Looking past the "technical jargon," the court held that the claim recited the "bare abstract idea" of "controlling access to resources by receiving a request and determining if the request for access should be granted." *Id.* at 1326.

Claim 1 of the '076 Patent is no different. The claimed "wireless end-user device," like the system in *Ericsson*, controls access (here, to the base station or other network resource) by applications at the device. Like the interception module in *Ericsson*, the claimed "processor[s]" intercept the "Internet access request" from the "application" to "classify" it. And like the decision module in *Ericsson*, the claimed "processor[s]" determine if the request for access should be granted by "allow[ing] or disallow[ing]" it. Claim 1, like the claim in *Ericsson*, boils down to "controlling access to resources."

This is abstract. As the Federal Circuit explained in *Ericsson*, "[c]ontrolling access to resources is exactly the sort of process that 'can be performed in the human mind, or by a human using pen and paper,' . . . ." *Id.* at 1327 (quoting *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011)). This process "is pervasive in human activity," the court stated, enumerating examples—from libraries and office buildings to banks—where "a request is made for access to a resource, that request is received and evaluated, and then the request is either granted or not." *Id.* The executive assistant's gatekeeping is yet another example. Time and again, the Federal Circuit has held claims directed to this process of controlling access to resources to be abstract. *See, e.g.*, *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1371–72 (Fed. Cir. 2017) (holding abstract a claim directed to "denying access to a transit system if the bankcard is invalid"); *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017 (Fed. Cir. 2017) (holding abstract claims directed to "providing restricted access to resources"); *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 982–83 (Fed. Cir. 2017) (holding abstract claims directed to "conditioning and controlling access to data"). This Court should do the same.

This process does not cease to be abstract because claim 1 confines it to a "wireless user-end device." In *Ericsson* and elsewhere, the Federal Circuit has explained that "limit[ing] the abstract

idea to a particular environment—a mobile telephone system—[] does not make the claims any less abstract for the step 1 analysis." 955 F.3d at 1327 (alterations in original) (quoting *In re TLI Comm'ns LLC Pat. Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016)); *see also Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017). Nor can claim 1 be saved by its invocation of a "wireless wide area network (WWAN) modem" and "processors." "[N]ot every claim that recites concrete, tangible components escapes the reach of the abstract-idea inquiry." *TLI*, 823 F.3d at 611. Where "the specification makes clear that the recited physical components merely provide a generic environment in which to carry out the abstract idea," the claim remains abstract. *Id.*

In *TLI*, for example, the claims were drawn to the abstract idea of "classifying an image and" taking action "based on its classification"—much like the "classify[ing]" and "allow[ing] or disallow[ing]" in the claim here. *Id.* While the claims recited "concrete, tangible components such as 'a telephone unit' and 'a server,'" the court pointed out that "[t]he specification fail[ed] to provide any technical details for the[se] tangible components." *Id.* at 611–12. "[I]nstead," the court stated, the specification "predominately describe[d] the system and methods in purely functional terms." *Id.* at 612. This, the court concluded, indicated that "the focus of the patentee and of the claims was not on an improved telephone unit or an improved server," but rather on an abstract idea. *Id.* at 612–13.

The modem and processors of claim 1 are the same. The modem, for example, is generically described as "modem module hardware or [a] modem chipset." '076 Patent at 61:23–27; *see also id.* at 61:37–46 ("modem chipset hardware [or] software package"), 77:53–62 ("a modem card and/or a modem chip"). The '076 Patent even allows that some "other interface[]" could be used instead. *Id.* at 99:23–32.

The processors are likewise generically described. The '076 Patent states, for example, that the "processor . . . may be, for example, a conventional microprocessor such as an Intel Pentium microprocessor or Motorola power PC microprocessor." *Id.* at 99:33–35. Throughout, the '076 Patent allows varied implementations of the processor in which "all or a portion of the . . . processor . . . functions are implemented in hardware," or "all or substantially all of the . . . functionality . . . is implemented and stored in software." *Id.* at 48:14–21; *see also id.* at 58:60–67 ("processor hardware

and/or software"), 77:47–52 (the "processor can be implemented in software" and "executed in" the "CPU, APU, SIM chipset, modem, . . . SIM, other hardware function on the device, and/or any combination of the above"). The processor may be "implemented on the modem" and/or "implemented on the device." *Id.* at 61:19–27. These varied implementations belie any claim that the processor is anything but generic. Indeed, the '076 Patent expressly states that the processor may simply be "a standard feature set contained in a modem chipset hardware [or] software package," or "a general component that is temporarily configured to perform the task." *Id.* at 3:3–11, 61:37–46.

Thus, as in *TLI*, "[t]he specification fails to provide any technical details for the tangible components." 823 F.3d at 612. "[I]nstead," as in *TLI*, the '076 Patent "predominately describes the system . . . in purely functional terms," *id.*, repeatedly discussing "service processor functionality." '076 Patent at 30:6–13, 61:27–32. The '076 Patent even provides that, "[i]n some embodiments, all or substantially all of the service processor . . . functionality (e.g., as discussed herein) is implemented and stored in software that can be performed on (e.g., executed by) various components in [the] device." *Id.* at 48:14–21. Each of the modem and the processors is "described simply in terms of performing [the] generic computer functions" recited in the claims. *TLI*, 823 F.3d at 612. Just as the modem is claimed to "communicate data," the specification describes the modem as one example of a "communications interface" through which the "computer . . . interfaces to external systems"—a function a modem routinely performs. '076 Patent at 99:23–25. And just as the processor(s) are claimed to "classify" requests and "allow or disallow" them, the specification describes the processor "classifying . . . network access requests" and deciding whether to "block/allow" such requests—again, functions that processors routinely perform. *Id.* at 11:26–31, 13:14–30. Nothing in the '076 Patent, let alone in claim 1, suggests the processor achieves the claimed classifying, allowing, or disallowing in a manner that is different than a generic processor, or indeed that is different than the executive's assistant. This "fail[ure] to provide any technical details" for the claimed modem and processor(s) makes clear that, as in *TLI*, these generic components are "merely a conduit for the abstract idea." 823 F.3d at 612; *see also Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("To salvage

1    an otherwise patent-ineligible process, a computer must be integral to the claimed invention,

2    facilitating the process in a way that a person . . . could not.").

3          Finally, nothing in the asserted patents suggests any "improvement in the functioning of a

4    computer." *Enfish*, 822 F.3d at 1338. The purported advance of the '076 Patent is "protecting

5    network capacity" by "reduc[ing] demands on the network." '076 Patent at 11:16–26. But this

6    improvement is achieved not by improving the "modem" or "processor[s]" of the claim, but instead

7    through "generalized steps"—"classify[ing]" and "allow[ing] or disallow[ing]"—that are "to be

8    performed on a computer using conventional computer activity." *Enfish*, 822 F.3d at 1338–39. Thus,

9    the claim remains abstract, for "[a]n improved result, without more[,] stated in the claim, is not

10   enough to confer eligibility to an otherwise abstract idea." *Koninklijke KPN N.V. v. Gemalto M2M*

11   *GmbH*, 942 F.3d 1143, 1150 (Fed. Cir. 2019). In this manner, claim 1 is similar to that found

12   abstract by this Court in *Broadcom*. There, the specification alleged that the claimed "method for

13   balancing transmission unit traffic over network links" "enable[d] comparison of traffic flow across

14   heterogeneous network links, rather than over homogeneous network links." *Broadcom*, 2021 U.S.

15   Dist. LEXIS 174678, at *3–4, *17–18 (citation omitted). Nevertheless, this Court found that the

16   claim was directed to an abstract idea because, "[w]hile this may provide some efficiency benefits"

17   in the "utilization of network resources," the patent was devoid of any "improvements [that]

18   change[d] the functioning of the system in any way." *Id.* at *18 (citation omitted). The same is true

19   here. "[N]othing" in the '076 Patent "suggests that" the claimed wireless end-user device, its

20   modem, or its processor "functions differently from other conventional systems, or provides a

21   technological solution to a technological problem." *Id.* Thus, as in *Broadcom*, this claim is abstract.

22   *See also id.* at *20–22 (finding another claim abstract because "the specification does not indicate

23   that the network management server is anything more than a generic computer component").

24         At bottom, the "classify[ing]" and "allow[ing] or disallow[ing]" steps of claim 1 are an

25   example of the "essentially result-focused, functional . . . claim language [that] has been a frequent

26   feature of claims held ineligible under § 101." *Elec. Power*, 830 F.3d at 1356. An examination of

27   claim 1 reveals that "[t]he advance" the asserted patents "purport to make is a process" of classifying

28

15

1  and screening Internet access requests, "not any particular assertedly inventive technology for

2  performing those functions." *Id.* at 1354. The claim is "therefore directed to an abstract idea." *Id.*

3          **2.**     ***Alice* Step Two: Claim 1 Includes No Inventive Concept**

4         Claim 1 of the '076 Patent also lacks an inventive concept. The claimed functions of

5  "classify[ing]" and "allow[ing] or disallow[ing]" are not only abstract, these functions are also

6  "well-understood, routine, [and] conventional activities" that previous "processors" could perform,

7  as the specification admits. *Berkheimer*, 881 F.3d at 1367 (fourth alteration in original) (citation

8  omitted).

9         The function "classify[ing]" is something conventional devices already performed. For

10  instance, the '076 Patent acknowledges that, "[t]raditionally, mobile devices . . . are optimized to

11  preserve network capacity and protect network resources from being over taxed" using "specialized

12  protocols such as WAP [wireless access protocol]," then states that the claimed classifying occurs in

13  the same manner: "[t]he classification can occur on . . . a WAP [wireless access protocol] station."

14  '076 Patent at 4:22–28, 97:34–36; *see also id.* at 94:26–63 ("The wireless devices . . . can be

15  implemented as stations. . . . Thus, a station can be . . . a WAP station."). Likewise, the '076 Patent

16  concedes that the "block/allow" function corresponding to the claimed "allow[ing] or disallow[ing]"

17  is a "well known traffic control technique[]." *Id.* at 13:21–25.[3] When the abstract functions of

18  "classify[ing]" and "allow[ing] or disallow[ing]" are stripped away, all that remains is a "wireless

19  end-user device" with a "modem" and "processors." Thus, whether taken individually or

20  collectively, the limitations of claim 1 fail to provide significantly more than the abstract idea.

21         As noted above, the '076 Patent acknowledges that the "wireless end-user device" and its

22  claimed components—a "modem" and "one or more processors"—were conventional. The wireless

23  end-user device "may be a conventional computer system." *Id.* at 99:11–16. The modem is described

24  as merely a "communications interface" through which the "computer . . . interfaces to external

25

26  ─────────────────

27      [3] In any case, the processors' "use of the ineligible concept to which [the claim] is
directed"—that is, the "classify[ing] and allow[ing] or disallow[ing]"—"cannot supply the

28  inventive concept that renders the invention 'significantly more' than that ineligible concept."
*BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018).

DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:23-cv-04496-JST

systems"—a function a modem routinely performs. *Id.* at 99:23–25. And the specification expressly

proposes "[t]he processor . . . be, for example, a conventional microprocessor such as an Intel

Pentium microprocessor or Motorola power PC microprocessor." *Id.* at 99:33–35. Where, as here,

"the specification suggests that the[] components were conventional at the time the patent was filed,"

reciting these components "is not enough to make the asserted claims patent-eligible at step two."

*PlanetID*, 2021 U.S. Dist. LEXIS 30213, at \*21–22.

In this situation, the Federal Circuit has explained, the "[i]nquiry . . . must turn to any

requirements for *how* the desired result is achieved." *Elec. Power*, 830 F.3d at 1355. But here, there

are none. The "classify[ing]" of claim 1, for example, is recited in purely functional terms. The claim

recites "classify[ing] *whether* a first end-user application . . . is interacting with the user in the device

user interface foreground," but imposes no limits on *how* it is done. Indeed, the executive's assistant

could "classify *whether*" the application "is interacting with the user" in the same manner claimed

for the "processor[s]." The "allow[ing] or disallow[ing]" is, likewise, recited in purely functional

terms. The claim recites what the "allow[ing] or disallow[ing]" of the "request" is "*based on*," but

again imposes no limits on *how* it is done. Once more, the executive's assistant could "allow or

disallow" the request in the same manner claimed for the "processor[s]." The claim is focused on the

result itself, rather than how it is achieved. *See also PlanetID*, 2021 U.S. Dist. LEXIS 30213, at \*22

(finding no inventive concept where "the asserted claims do not specify how to employ these generic

computer and network components to achieve the functions described in the claims").

Finally, while Plaintiff's Complaint alleges that the '076 Patent claims a "nonconventional

and non-generic combination of claim limitations" that "improved upon what may have been

considered conventional or generic in the art at the time of the invention," ECF No. 1, ¶ 38, Plaintiff

offers no support for these bare statements. A "district court need not accept a patent owner's

conclusory allegations of inventiveness." *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371,

1379 (Fed. Cir. 2022); *see also Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365

(Fed. Cir. 2020) ("We disregard conclusory statements when evaluating a complaint under

Rule 12(b)(6)."); *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1365–66 (Fed. Cir. 2023)

(noting, in affirming the district court's grant of a Rule 12(b)(6) motion alleging ineligibility under

§ 101, that "conclusory allegations that the prior art lacked elements of the asserted claims are insufficient to demonstrate an inventive concept"); *see also Broadcom*, 2021 U.S. Dist. LEXIS 174678, at *19–20 (rejecting "conclusory allegation, unsupported by any facts," of an inventive concept).

The Federal Circuit has advised that a "helpful way of double-checking" whether *Alice*'s two-step framework has been correctly applied is to "invok[e] an important common-sense distinction between ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them." *Elec. Power*, 830 F.3d at 1356. Claim 1 here recites only ends, results, and functions: it aims to "classify" a request from an application and "allow or disallow" the request, and it does so merely by reciting that the functions of "classify[ing]" and "allow[ing] or disallow[ing]" are carried out by an admittedly conventional processor. Like other claims that fail to "explain *how* to achieve purported improvements," and "rather just recite the abstract idea," claim 1 "fail[s] to supply an inventive concept and raise[s] significant preemption concerns." *24/7 Customer, Inc. v. LivePerson, Inc.*, No. 15-cv-02897-JST, 2017 U.S. Dist. LEXIS 81479, at *19 (N.D. Cal. May 25, 2017) (Tigar, J.). Claim 1 is thus not patent eligible under § 101.

### 3.     The Dependent Claims Are Likewise Ineligible

The dependent claims of the '076 Patent recite only minor additional details that do not alter claim 1's focus on the abstract idea of screening a request by (1) classifying a request as higher priority or lower priority and (2) passing along or screening the request based on both its priority and how likely it is to lead to repeated requests. These claims recite, for example, additional details about when "the first end-user application is" or is not "interacting with the user in the device user interface foreground" (claims 2–4); what the "power control state" is (claims 10–12); what happens when the request is "disallowed" (claims 5, 15, 16); when to "allow" a request (claims 6, 7); when a determination to "allow or disallow" is changed (claims 13, 14); and a "user interface" (claim 8). And claim 9 recites an additional modem—"a wireless local area network (WLAN) modem"—that is just as conventional as the WWAN modem in claim 1. The dependent claims also fail § 101 where, as here, "all the claims are 'substantially similar and linked to the same abstract idea.'"

18

1  *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348

2  (Fed. Cir. 2014) (citation omitted). Whether taken alone or in combination, these limitations do not

3  provide significantly more than the abstract idea.

4  **B.     The '700 Patent Is Ineligible Under 35 U.S.C. § 101**

5  **1.     *Alice* Step One: Claim 1 Is Directed to an Abstract Idea**

6  Claim 1 of the '700 Patent is directed to assisting with scheduling activities according to

7  rules by (1) associating rules with applications, (2) receiving requests from the applications to

8  schedule activities, and (3) scheduling activities for each application according to the rules

9  associated with that application. As explained below, these are the same three steps routinely

10  performed by humans to assist people with scheduling activities according to rules and are,

11  accordingly, abstract.

12  **a.     Claim 1 Is Directed to Scheduling Activities**

13  The three-step process for scheduling activities is apparent from the language of the claim.

14  The claimed "wireless end-user device" includes three functionally named components—"an activity

15  classifier," an "Application Programming Interface (API)," and "a launch manager"—that each

16  perform a step of the abstract idea. '700 Patent at 107:33–52. The "activity classifier," for example,

17  performs the first step, associating rules with applications, by "dynamically associat[ing] one or

18  more corresponding network access policy controls with each of the plurality of executable

19  applications." *Id.* The "network access policy controls" are nothing more than rules that indicate,

20  among other things, when an application's activity should be "delay[ed]." *Id.* at 66:38–54. The

21  "Application Programing Interface (API)" performs the second step of receiving requests from the

22  applications to schedule activities. *Id.* at 107:41–45. As the claim recites, the API is "accessible to"

23  and "callable by" the applications "to request an execution time." *Id.* The "execution time" is, for

24  example, the time that the application's activity will occur. *Id.* at 66:38–54. Finally, the "launch

25  manager" performs the third step of scheduling activities for each application according to the rules

26  associated with that application. *Id.* at 107:47–52. The claim recites that the launch manager

27  "schedule[s]" execution times for applications that request them through the API "according to the

28  . . . network access policy controls," that is, the rules. *Id.*

1    Thus, together, these three components serve to (1) associate rules with applications,

2    (2) receive requests from the applications to schedule activities according to the rules for that

3    application, and (3) schedule activities for each application according to its rules.

4    **b.    Scheduling Activities Is an Abstract Idea**

5    Scheduling activities according to rules is an abstract idea. An analogy to human activity is

6    straightforward: humans routinely (1) associate rules with particular people, (2) receive requests

7    from those people to schedule activities, and (3) schedule activities for each person according to the

8    rules for that person. Consider again the executive's assistant. This assistant routinely schedules

9    requested meetings with an executive according to rules.

10    The assistant associates people with rules regarding when each person may meet with the

11    executive, just as the "activity classifier" associates "policy controls" with executable applications

12    regarding when each application may execute. For example, according to the assistant's rules, a

13    colleague may be allowed to meet with the executive over lunch, while a job applicant may only be

14    allowed to meet with the executive during designated interview times. These rules may be applied

15    "dynamically" by the assistant, e.g., to reflect changes in the executive's availability. People

16    requesting a meeting with the executive request a meeting time through the executive's assistant, just

17    as the claimed "applications" request an "execution time" through the "Application Programming

18    Interface." And when the assistant receives requests, the assistant schedules the meeting for each

19    person according to the rules, just as the "launch manager" schedules "execution times" according to

20    the "policy controls." As shown below, the language of the claims maps to this common human

21    activity.

22

23

24

25

26

27

28

| Claim Language | Human Activity |
|---|---|
| "**dynamically associate** one or more corresponding network access policy controls with each of [a] plurality of executable applications" | **dynamically associate** meeting time rules with people |
| "[be] callable by each of the executable applications to **request** an execution time . . . " | be able to receive a **request** from each person seeking a meeting |
| "**schedule corresponding execution times** for applications requesting an execution time . . . , according to the respective network access policy controls for each application." | **schedule corresponding meeting times** for each person according to that person's rules |

The claimed steps of "associat[ing]" rules ("policy controls") with requestors ("applications"), receiving "request[s]" from the requestors, and "schedul[ing]" the requestors according to the rules for each requestor are the same steps gone through by an executive's assistant to schedule meetings. Put differently, "[i]f all generic computer-implemented steps were stripped from the . . . claims, all that would be left would be [steps] . . . , which [the executive assistant] could easily perform." *PlanetID*, 2021 U.S. Dist. LEXIS 30213, at *13. The Federal Circuit has "treated analyzing information by steps people go through in their minds . . . , without more, as essentially mental processes within the abstract-idea category." *Elec. Power*, 830 F.3d at 1354; *see also Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 839 F. App'x 520, 526 (Fed. Cir. 2021) ("We have previously held that a process that can be and has been performed by humans without the use of a computer . . . is an abstract idea.").

Scheduling activities according to rules is akin to "controlling access to resources," which the Federal Circuit deemed abstract in *Ericsson* (as discussed above). Like claim 1, which controls access to "execution times" by "application[s]" at a "wireless end-user device," *Ericsson* involved a claim to a "system for controlling access to a platform" by "application[s]" at a "mobile phone[]." 955 F.3d at 1325–26 (citation omitted). Just as the "Application Programming Interface" of claim 1 receives a "request" from an application, *Ericsson*'s "interception module" "receiv[ed] a request"

1    from the application. *Id.* (citation omitted). And just as the "launch manager" of claim 1 determines

2    what requested "execution time" should be granted to the application, *Ericsson*'s "decision entity"

3    "determin[ed] if the request should be granted." *Id.* Here, as in *Ericsson*, claim 1 is "directed to the

4    abstract idea of controlling access to, or limiting permission to, resources." *Id.* at 1326.

5        In *RingCentral, Inc. v. Dialpad, Inc.*, this Court similarly considered claims relating to "a

6    message management server" that "receive[s] a message" associated with a subscriber and "send[s]"

7    it "according to distribution rules associated with the . . . subscriber." 372 F. Supp. 3d 988, 996

8    (N.D. Cal. 2019) (Tigar, J.) (citation omitted). "[A]nalogiz[ing] the claimed system to a corporate

9    mailroom," this Court found the claims abstract, noting that "there is nothing in the claims

10   themselves that foreclose them from being performed by a human, mentally or with pen and paper."

11   *Id.* at 996–97 (quoting *Intell. Ventures*, 838 F.3d at 1318). Likewise, here, there is nothing that

12   forecloses the claimed "associat[ing]" of "policy controls" with "applications," receiving of

13   "request[s]," and "schedul[ing]" of the requests according to the "policy controls" from being

14   performed by a human.

15       Another similar case from this Court is *24/7 Customer*, which held that claims for "routing an

16   incoming call to a customer service representative" based on the "caller['s] profile" were directed to

17   "an abstract idea related to basic customer service." 2017 U.S. Dist. LEXIS 81479, at *5–6, *9

18   (Tigar, J.) (citation omitted). This Court highlighted that the "claims d[id] not provide for any

19   specific implementation of this abstract idea" by, e.g., "specify[ing] the structure or content of the

20   profiles . . . , or even how the profile information should be analyzed to achieve the proposed

21   solution." *Id.* at *10. Here, too, the claims do not provide any specific implementation of the claimed

22   "policy controls," nor do they specify how the policy controls should be analyzed to "schedule . . .

23   [the] execution times." Instead, the claims provide "a generalized solution in broad, functional

24   language," *id.* at *10–11, that says only that the scheduling is "according to" the "policy controls."

25   Like the claims in *24/7 Customer*, claim 1 of the '700 Patent "recite[s] the *what* of the [alleged]

26   invention, but none of the *how* that is necessary to turn the abstract idea into a patent-eligible

27   application." *Id.* at *11 (quoting *TDE Petrol. Data Sols., Inc. v. AKM Enter., Inc.*, 657 F. App'x 991,

28   993 (Fed. Cir. 2016)). Claim 1 is, accordingly, abstract.

1

2. ***Alice* Step Two: The Claims Include No Inventive Concept**

2          Claim 1 of the '700 Patent also lacks an inventive concept. When the abstract functions of

3   "associat[ing]" "policy controls" with "applications," receiving "request[s]," and "schedul[ing]" the

4   requests according to the "policy controls" are stripped away, all that remains are the claimed

5   "wireless end-user device," "wireless modem," "activity classifier," "Application Programming

6   Interface (API)," and "launch manager." "[L]imiting the claim[] to the particular technological

7   environment" of the wireless end-user device "is, without more, insufficient to transform [it] into"

8   something patent eligible. *Elec. Power*, 830 F.3d at 1354; *see also TLI*, 823 F.3d at 613–14 (finding

9   the recited "telephone unit" did not "transform the abstract idea" because "the telephone unit simply

10  provides the environment in which the abstract idea . . . is carried out"). Whether taken alone or in

11  combination, the limitations of claim 1 do not provide significantly more than the abstract idea.

12          Nowhere does the specification suggest that the claimed "wireless end-user device" or

13  "wireless modem" is inventive. '700 Patent at 39:65–40:5, 101:26–47. And each of the remaining

14  claimed components—"activity classifier," "Application Programming Interface (API)," and "launch

15  manager"—is described generically as an "engine" that "includes a dedicated or shared processor

16  and, typically, firmware or software modules that are executed by the processor." *Id.* at 97:38–45,

17  103:34–57. Such an "engine" can by varyingly implemented with its functionality "centralized" or

18  "distributed," and as "hardware, firmware, or software embodied in a computer-readable medium for

19  execution by the processor"—and the processor is described as "a conventional microprocessor such

20  as an Intel Pentium microprocessor or Motorola power PC microprocessor." *Id.* at 97:38–45,

21  101:48–50. Likewise, the "Application Programming Interface (API)" is described to be "an open

22  API or standard/required API (e.g., required or standardized for applications for a certain network

23  service provider . . . ) published for application and OS developers." *Id.* at 75:36–44.

24          Finally, the only functions the "activity classifier," "Application Programming Interface

25  (API)," and "launch manager" perform are admittedly well-understood, routine, and conventional.

26  *See, e.g.*, *id.* at 4:25–27 ("[t]raditionally, mobile devices . . . are optimized to preserve network

27  capacity"). Likewise, the "delay, priority queue, [and] time window" functions synonymous with the

28  claimed "schedul[ing]" are conceded to be a "well known traffic control technique[]." *Id.* at 13:26–

1  42. Where, as here, "the specification . . . describes the [claimed components] as either performing

2  basic computer functions . . . or performing functions 'known' in the art," these components can lend

3  no inventive concept. *TLI*, 823 F.3d at 613–14. Finally, while Plaintiff's Complaint alleges the

4  '700 Patent claims a "nonconventional and non-generic combination of claim limitations" that

5  "improved upon what may have been considered conventional or generic in the art at the time of the

6  invention," ECF No. 1, ¶ 53, Plaintiff offers no support for these bare statements and they should not

7  be accepted. *IBM*, 50 F.4th at 1379.

8        A "double-check[]" confirms that *Alice*'s two-step framework has been correctly applied:

9  claim 1 here recites the "desired results (functions)" of associating policy controls with applications,

10 receiving requests, and scheduling the requests according to the policy controls, not any "particular

11 ways of achieving (performing) them." *Elec. Power*, 830 F.3d at 1356. Such a claim "fail[s] to

12 supply an inventive concept and raise[s] significant preemption concerns." *24/7 Customer*, 2017

13 U.S. Dist. LEXIS 81479, at *19. Thus, claim 1 is not patent eligible under § 101.

14              **3.      The Dependent Claims Are Likewise Ineligible**

15       The dependent claims of the '700 Patent recite only minor additional details that do not alter

16 claim 1's focus on the abstract idea of assisting with scheduling activities according to rules by

17 (1) associating rules with applications, (2) receiving requests from the applications to schedule

18 activities, and (3) scheduling activities for each application according to the rules associated with

19 that application. These claims recite, for example, additional details about the "network access

20 policy controls" (claims 2–5, 19); what the "schedul[ing]" entails (claims 6, 17, 18, 20); what the

21 "request" includes (claims 7–10); a "user interface" (claim 11); what "dynamically" means

22 (claims 12–14); and the "launch manager" receiving a "list" and being "integrated" with a

23 "broadcast intent manager" (claims 15, 16). The dependent claims are ineligible where, as here, "all

24 the claims are 'substantially similar and linked to the same abstract idea.'" *Content Extraction*, 776

25 F.3d at 1348 (citation omitted). Whether taken alone or in combination, these limitations do not

26 provide significantly more than the abstract idea.

27

28

1

## V.      CONCLUSION

2          Software inventions can be patent eligible only "where they have made *non-abstract*

3   improvements to existing technological processes and computer technology." *Koninklijke*, 942 F.3d

4   at 1150 (emphasis added) (collecting cases). For the foregoing reasons, the '076 and '700 Patents

5   have not. Instead, they use admittedly generic computer components as they have conventionally

6   been used to simply do what humans have done in their mind for ages. Accordingly, Defendants

7   request that their motion to dismiss be granted without leave to amend.

8

9   Dated: February 27, 2024                FINNEGAN, HENDERSON, FARABOW,
                                               GARRETT & DUNNER, LLP
10

11                                         By:    */s/ Daniel C. Cooley*
                                               Daniel C. Cooley
12                                             *Attorney for Defendants*
                                               *Motorola Mobility LLC and*
13                                             *Lenovo (United States) Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28