Marc Fenster (SBN 181067)
mfenster@raklaw.com
Reza Mirzaie (SBN 246953)
rmirzaie@raklaw.com
Brian Ledahl (SBN 186579)
bledahl@raklaw.com
Ben Wang (SBN 228712)
bwang@raklaw.com
Paul Kroeger (SBN 229074)
pkroeger@raklaw.com
Neil A. Rubin (SBN 250761)
nrubin@raklaw.com
Philip Wang (SBN 262239)
pwang@raklaw.com
Amy Hayden (SBN 287026)
ahayden@raklaw.com
Kristopher Davis (SBN. 329627)
kdavis@raklaw.com
Jason M. Wietholter (SBN 337139)
jwietholter@raklaw.com
**RUSS AUGUST & KABAT**
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-9226

*Attorneys for Plaintiff,*
*Headwater Research LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| HEADWATER RESEARCH LLC,<br><br>Plaintiff,<br><br>v.<br><br>MOTOROLA MOBILITY LLC AND LENOVO (UNITED STATES) INC.,<br><br>Defendants. | Case No. 4:23-cv-04496-JST<br><br>**PLAINTIFF HEADWATER'S (CORRECTED) OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT UNDER 35 U.S.C. § 101**<br><br>Jury Trial Demanded<br><br>Date:     Thursday, April 18, 2024<br>Time:    2:00 p.m.<br>Location:  Courtroom 6, 2nd Floor<br>Judge:   Hon. Jon S. Tigar |

RUSS, AUGUST & KABAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ON THE ASSERTED PATENTS ............................................1

        A.      The '076 Patent's Wireless-Device Solutions to Overcome Specific
                Wireless-Device and Wide Area Network Congestion Problems. ............2

        B.      The '700 Patent's Wireless-Device Solutions to Overcome Specific
                Wireless-Device And Network Congestion Problems. ..............................5

III.    LEGAL STANDARDS ..........................................................................................7

IV.     THE '076 PATENT CLAIMS ARE ELIGIBLE UNDER 35 U.S.C. § 101 ........7

        A.      *Alice* Step One: Claim 1 Is Not Directed to an Abstract Idea ................7

                1.      Claim 1 is directed to improvements in a wireless user
                        device and wide area network and is, therefore, patent-
                        eligible ............................................................................................8

        B.      Defendants' Arguments Fail as a Matter of Law and the Factual Record ............10

                1.      Defendants' premise that claim 1 is directed to "screening
                        requests" is legal error as it ignores the claim language and
                        claimed advance. .............................................................................11

                2.      Contrary to Defendants' assertions, claim 1 cannot
                        plausibly be performed by the mind of a human "executive
                        assistant." ........................................................................................11

                3.      Claim 1 does not merely recite an aspirational result; it
                        specifically improves wireless user devices and associated
                        networks. ..........................................................................................13

        C.      *Alice* Step Two: Defendants Cannot Show Claim 1 Lacks Inventive
                Concepts ......................................................................................................14

                1.      The intrinsic evidence confirms that claim 1 is inventive. ...........14

                2.      Defendants' arguments fail on the law and facts. ..........................15

                3.      Claim 1 sets forth "how" the steps are performed. .......................17

                4.      Claim 1 is inventive under *BASCOM*. ..........................................18

        D.      Defendants Also Fail to Show Ineligibility for Any Other Claim ........19

V.      THE '700 PATENT CLAIMS ARE ALSO ELIGIBLE UNDER 35 U.S.C. § 101 ..........20

        A.      *Alice* Step One: Claim 1 Is Not Directed to an Abstract Idea ................20

                1.      Claim 1 is directed to improvements in a wireless user
                        device and wide area network and is, therefore, patent-
                        eligible ............................................................................................20

                2.      Defendants' step one assertion—that claim 1 is directed to
                        "scheduling activities"—is fatally flawed. ...................................22

        B.      *Alice* Step Two: Defendants Cannot Show Claim 1 Lacks Inventive
                Concepts ......................................................................................................23

RUSS, AUGUST & KABAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      C.      Defendants Also Fail to Show Ineligibility for Any Other Claim ........................25

VI.    CONCLUSION ..................................................................................................................25

HEADWATER'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER § 101

## TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018).................................................... 19, 20, 25

*Alice Corp. Pty. v. CLS Bank Int'l*,
   573 U.S. 208 (2014) ............................................................................ 7

*Ancora Techs., Inc. v. HTC Am., Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018)......................................................... 7, 8

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016)........................................... 7, 18, 23, 24

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018).......................................................... 7, 19

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019)............................................................. 15

*Core Wireless Licensing S.A.R. L. v. LG Elecs., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018)......................................................... 10, 12

*Data Engine Techs. LLC, v. Google, LLC*,
   906 F.3d 999 (Fed. Cir. 2018).......................................................... 12, 22

*Droplets, Inc. v. Yahoo!, Inc.*,
   No. 12-cv-03733-JST, Dkt. No. 1165 (N.D. Cal. Aug. 25, 2022) .................. 10

*Elec. Power Grp., LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016)............................................................. 17

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016).............................................................. 7

*Ericsson Inc. v. TCL Communication Techs. Holdings Ltd.*,
   955 F.3d 1317 (Fed. Cir. 2020)...................................................... 13, 14, 22

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
   942 F.3d 1143 (Fed. Cir. 2019)......................................................... 10, 21

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016)......................................................... 8, 10

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
   521 F.3d 1097 (9th Cir. 2008) .............................................................. 7

*MyMail, Ltd. v. ooVoo, LLC*,
   934 F.3d 1373 (Fed. Cir. 2019)............................................................. 20

*Packet Intelligence LLC v. NetScout Systems, Inc.*,
   965 F.3d 1299 (Fed. Cir. 2020)......................................................... 9, 21

*SRI International, Inc. v. Cisco Systems, Inc.*,
   930 F.3d 1295 (Fed. Cir. 2019)......................................................... 12, 22

*Synopsys, Inc. v, Mentor Graphics Corp.*,
   839 F.3d 1138 (Fed. Cir. 2016)............................................................. 11

HEADWATER'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER § 101

RUSS, AUGUST & KABAT

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
    957 F.3d 1303 (Fed. Cir. 2020)................................................................................ 9, 16, 21

*VidStream, LLC v. Twitter, Inc.*,
    No. 3:16-CV-0764-N, 2022 WL 992743 (N.D. Tex., Apr. 1, 2022)............................... 18

HEADWATER'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER § 101

1

**I.      INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED**

2

3          This Court must decide whether the asserted claims are patent-eligible under 35 U.S.C. §

4  101. Defendants' motion should be denied. Defendants fail at both steps of the patent-eligibility

5  inquiry. At Step One, Defendants strip the claims of any meaning, boiling each patent down to a

6  two-word summary. They assert the '076 patent claims are directed to "screening requests" and

   the '700 patent claims are directed to "scheduling activities." Even a cursory review refutes this.

7          For example, the '076 patent is entitled "Wireless end-user device with power-control-

8  state-based wireless network access policy for background applications." And the claims recite

9  just such a wireless user device with detailed limitations for *selectively disallowing* WWAN

10  Internet access requests by an application based on a *power control state* and a determination that

11  the application is *not interacting with the user in the device's foreground*. The '700 patent is

12  similar. It claims a wireless user device with (1) an activity classifier for dynamically associating

13  network access policy controls with each application, (2) an API callable by each application to

14  request an execution time according to the network controls, and (3) a launch manager to schedule

15  execution times for each application according to the network controls.

16          That Defendants would characterize these patents and claims as "screening requests" or

17  "scheduling activities" only confirms the improper approach taken. Defendants fail to show any

18  claim is directed to a patent-ineligible abstract idea. And Defendants fail to provide any evidence—

19  much less clear and convincing evidence—that the claimed inventions are conventional.

20  **II.     BACKGROUND ON THE ASSERTED PATENTS**

21          The Asserted Patents are derived from a common specification and co-invented by the

22  same three inventors, including Dr. Gregory Raleigh, who is world renowned for inventing the

23  MIMO technology used in contemporary Wi-Fi, 4G, and 5G standards. Having worked at the

24  cutting edge of wireless innovations prior to joining forces, the inventors knew that "with the

25  advent of mass market digital communications, applications and content distribution" around the

26  time of the invention in 2009, "many access networks such as wireless networks" were being

27  "pressed for user capacity." '076 patent at 1:8-11. They also realized that, on the wireless devices

28  that had to communicate with those networks, network and battery resources were tied up by the

RUSS, AUGUST & KABAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT

transmission and receipt of specific wireless access requests by applications on the wireless device. *E.g.*, *id.* at 8:4-56, 10:29-56. With these and other problems in mind, the inventors set out to create new solutions to them and to teach them to the world in detail. And with nearly 30 technical figures and over 100 columns of technical specification teachings, they did just that.

### A. The '076 Patent's Wireless-Device Solutions to Overcome Specific Wireless-Device and Wide Area Network Congestion Problems.

The '076 patent tackled a specific set of technical problems relating to "a ***network capacity crunch*** [] developing due to increasing network congestion on various wireless networks, such as mobile networks." *Id.* 3:28-33. The inventors recognized that the "increasing popularity of various smart phone devices" such as the "Apple iPhone" was going to overwhelm the network and lead to a devastating network capacity crunch. *Id.* 3:32-4:21 (describing "if multiple and/or all devices allow all applications to indiscriminately access or attempt to access network resources or transmit/receive traffic, then the network can generally become overloaded.").

The inventors also recognized that certain ***application behavior*** on wireless end user devices (e.g., "background network accesses and signaling," "background email downloads") was leading to ***wasteful signaling*** that was exacerbating the network capacity crunch: "Additional application behavior that can significantly tie up network resources and capacity include, for example, conference meeting services, video streaming, content update, software update, and/or other or similar application behavior. For example, ***even when the user is not directly interacting with or benefiting from this type of application, the application can be running in the background and continuing to consume potentially significant network resources***." *Id.* at 8:15-22.[1] Examples of this behavior included "software updates for OS and applications, frequent OS and application background network accesses and signaling, frequent network discovery and/or signaling …, inefficient network access sequences during frequent power cycling or power save state cycling, [and] large downloads or other high bandwidth accesses." *Id.* at 8:23-40.

The inventors also recognized another shortcoming associated with this wasteful signaling in the form of its impacts on the ***power consumption*** of the wireless device itself. That is because

---

[1] All emphasis in quoted material has been added unless otherwise noted.

when the device subsystem and/or modem subsystem sends signals or goes through "power cycling or transitions from one power save state to another," more battery or other power is consumed each time. *Id.* at 7:42-45, 8:36-37 ("inefficient network access sequences during frequent power cycling or power save state cycling"). The inventors correctly expected the number of wireless users and connections to wireless network to skyrocket, and all those wasteful signals to access the network can really add up. *E.g.*, *id.* at 3:28-43, 8:57-9:10.

While other means of tackling network usage and device power waste were being discussed in the art, those were not good enough. For instance, "[n]etwork carriers have typically attempted to manage network capacity using various ***purely central/core network based approaches,***" which provide a poor user experience and prompt wasteful attempts to re-establish a network connection. *Id.* at 9:23-63 ("Purely centralized network solutions with no assistance from a device based software agent (or service processor) can have several limitations…"). And even where smart phone vendors attempted to "address this problem and save battery life on their devices [by] implement[ing] a fast dormancy feature," the inventors recognized that actually "exacerbate[s] this problem by prematurely requesting a network release only to follow [] with a request to connect [] to the network or by a request to re-establish a connection with the network." *Id.* at 9:11-22.

So, the inventors conceived and taught something different: a way to decentralize network congestion controls away from "purely centralized network solutions with no assistance from a device based software agent" toward "***Device Assisted Services (DAS) for protecting network capacity***" that rely on the ***wireless end user device*** to determine whether certain network signals are relatively wasteful and control network access accordingly, thus solving the technical problems described by the inventors while not significantly impacting the user experience. *Id.* 11:15-12:27 (describing, e.g., "techniques are provided for classifying network service activities associated with one or more applications or OS functions to a background service class and differentially controlling the background service class traffic."). This was a tricky balance to strike. But the inventors discovered the technical solution of using the mobile device to detect and control access for background activities for which limiting network access would have a negligible impact on the end user but a large benefit in reducing power consumption and network congestion. In the '076

RUSS, AUGUST & KABAT

1  claims, the mobile device uses the <u>power control state of the device</u> and <u>whether the application is</u>

2  <u>interacting with the user in the user interface foreground</u> to control Internet access requests made

3  by an application. *E.g.*, *id.* at cl. 1. The inventors recognized the efficiencies of controlling access

4  based on whether an application is interacting with the user in the "foreground" could be enhanced

5  by managing access requests according to various power states of the device to reduce unnecessary

6  consumption. *E.g.*, *id.* at cl. 1; *id.* at 10:43-48 ("intelligent network monitoring" can include

7  "managing network access connection requests resulting from repeated power down modes in the

8  modem, which can cause resource intensive re-connection and/or re-authentication process").

9       The claimed inventions thus solve the network capacity crunch by configuring each mobile

10  device to determine whether an application is "interacting with the user in the device user interface

11  foreground" (something impossible for the core network to determine) and to trigger the claimed

12  functionality accordingly, as exemplified in Figure 3, shown below with key portions annotated.

13  In some embodiments, "the network service usage control policy is dynamic based on one or more

14  of the following … ***a power state of device*** … monitoring the power consumption behavior of the

15  service activity, modem power

16  cycling or ***power control state***

17  ***changes***." *Id.* at 84:35-53. And

18  "[a]dvantageously, the differential

19  network access control engine can

20  restrict network access of a particular

21  service usage activity when a

22  condition is satisfied, such as when

23  the service usage activity is a

24  ***background activity***." *Id.* at 102:12-

25  15. Moreover, "before a connection is

26  allowed to be opened (e.g., before a socket is opened), transmission, or a flow/stream is initiated**,**

27  *it is blocked*"—not delayed or queued. *Id.* 91:41-49.

28       Notably, claim 1 recites specific elements (emphasized below) to achieve these benefits:



FIG. 3

RUSS, AUGUST & KABAT

1. A wireless end-user device, comprising:
a wireless wide area network (WWAN) modem to communicate data for Internet service activities between the device and at least one WWAN, when configured for and connected to the at least one WWAN; and
one or more processors configured to, for a time when data communication for Internet service activities is provided by the WWAN modem and the at least one WWAN, *classify whether* a first end-user application associated with an Internet access request, and capable of both interacting with a user in a user interface foreground of the device, and at least some Internet service activities when not interacting with a user in the device user interface foreground,
*is interacting with the user in the device user interface foreground*, and
allow or disallow the Internet access request *based on the classification as to whether the first end-user application is interacting with the user and based on a power control state,* such that
*when the power control state is a first power control state and the first end-user application is classified as not interacting with the user, the Internet access request is disallowed,* and
when the power control state is at least one other power control state, *the Internet access request is allowed.*

## B.  The '700 Patent's Wireless-Device Solutions to Overcome Specific Wireless-Device And Network Congestion Problems.

The '700 patent solves similar technical problems. Mobile applications perform numerous activities that are *imperceptible to the user*. The '700 patent recognizes the problem of such application activities frequently "running in the background and continuing to consume potentially significant network resources," such as "software updates," "background network accesses and signaling," "background email downloads," "inefficient network access sequences during frequent power cycling or power save state cycling," among other examples. '700 patent at 8:9-48. As the patent explains, such problematic background activities occur "when the user is not directly interacting with or benefiting from this type of application." *Id.* at 8:24-28.

The inventors found ways to solve this problem that would be impossible for a human being, using a device-focused approach that differed from network-centric prior art techniques, as discussed above with respect to the '076 patent. For example, claim 1 of the '700 patent recites a wireless end-user device that includes an activity classifier for identifying such application activities and dynamically associating network access controls with applications. *Id.* at cl. 1. This enables more restrictive network access controls for background application activities that "the user is not directly interacting with or benefiting from" but that are nonetheless "continuing to consume potentially significant network resources." *Id.* at 8:24-28. The claimed inventions further

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

require a launch manager that selects execution times for network access requests made through an API, where the execution times are based on corresponding network access policy controls for applications running on the mobile device. *Id.* at cl. 1. Indeed, in some embodiments, before a given device application activity is allowed to start, the intention to start is intercepted by a launch manager, the background service policy set is retrieved, and necessary user notifications or launch control policies are implemented before allowing the activity to launch. *Id.* at 66:38-47.

The specification further explains that "techniques are needed to preserve network capacity by, for example, differentially controlling these types of network service usage activities in various ways depending on the type of service activity requesting network access." *Id.* at 8:57-62. Thus, "techniques are provided for classifying network service activities associated with one or more applications or OS functions to a background service class and differentially controlling the background service class traffic." *Id.* at 12:26-30. With reference to Figure 27, reproduced at right with key portions annotated, the patent further explains that "[a]dvantageously, the differential network access control engine can restrict network access of a particular service usage activity when a condition is satisfied, such as when the service usage activity is a background activity." *Id.* at 104:30-33.



FIG. 27

Emphasized below, claim 1 recites the specific way to achieve such benefits:

1. A wireless end-user device comprising:
    at least one wireless modem to provide network access for the wireless end-user device;
    *an activity classifier to,* for each of a plurality of executable applications stored on the wireless end-user device, *dynamically associate one or more corresponding network access policy controls with each of the plurality of executable applications*;
    an Application Programming Interface (API) accessible to each of the plurality of executable applications, *the API callable by each of the executable applications to*

*request an execution time according to the corresponding network access policy controls for that application*; and
          *a launch manager to schedule corresponding execution times for applications requesting an execution time through the API*, the launch manager selecting corresponding execution times, for the applications requesting execution time, *according to the respective network access policy controls for each such application*

## III.    LEGAL STANDARDS

To determine patent eligibility under § 101, courts conduct a two-step analysis as articulated by the Supreme Court in *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The court must determine "(1) whether the claim, as a whole, is 'directed to' patent-ineligible matter—here, an abstract idea—and (2) if so, whether the elements of the claim, considered individually or as an ordered combination 'transform the nature of the claim' into a patent-eligible application." *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1347 (Fed. Cir. 2018).

"[T]he first step of the inquiry is a meaningful one," and the "directed to" inquiry requires consideration of the claims "in light of the specification" to determine if "their character as a whole is directed to excluded subject matter." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). If they are not, the claims are eligible under § 101. *Ancora*, 908 F.3d at 1349.

But if the claims are directed to an abstract idea, Step Two calls for the court to "consider the elements of each claim both individually and 'as an ordered combination' to determine whether [the claims contain] an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself.'" *Alice*, 573 U.S. at 217-18. Even where elements are conventional, the specific arrangement of conventional technologies can also form the inventive concept. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).

"[W]hether a claim recites patent eligible subject matter is a question of law which may contain underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Dismissal under Rule 12 "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

## IV.    THE '076 PATENT CLAIMS ARE ELIGIBLE UNDER 35 U.S.C. § 101

### A.    *Alice* Step One: Claim 1 Is Not Directed to an Abstract Idea

RUSS, AUGUST & KABAT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT

### 1.      Claim 1 is directed to improvements in a wireless user device and wide area network and is, therefore, patent-eligible.

The Federal Circuit has made clear that the "directed to" analysis must consider "the claims as a whole" and account for and examine each invention's "*claimed advance*" in the art according to the record. *Ancora Techs.*, 908 F.3d at 1347-49. Skipping over this analysis is legal error, as the claimed advance "allow[s] for the improvement realized by the invention." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016).

Reviewing the intrinsic record here, the claimed advance of claim 1 of the '076 patent is "directed to" a decentralized solution for network congestion that places network controls into a wireless end user device that *selectively disallows* WWAN Internet access requests by an application based on a *power control state* and a determination that the application is *not interacting with the user in the device's foreground*. The specification makes clear that prior art wireless devices suffered from power shortcomings and burdened the network with too many wasteful signal transmissions. *E.g.*, '076 patent at 7:50–62, 8:15-22 ("Additional application behavior that can significantly tie up network resources and capacity include, for example, conference meeting services, video streaming, content update, software update, and/or other or similar application behavior. Even when the user is not directly interacting with or benefiting from this type of application, the application can be running in the background and continuing to consume potentially significant network resources."). These problems were specific to wireless end-user devices and the networks with which they communicate. *E.g.*, *id.* at 8:23-40. And these problems are unlike human problems that existed before such wireless devices and networks.

The specification demonstrates that the inventors taught technical solutions that were different from the prior art. The invention decentralizes network congestion controls away from "purely centralized network solutions with no assistance from a device based software agent (or service processor)" in favor of "controlling network service usage activities at the source of the demand—the device." *Id.* 9:23-63. The inventors describe such device-embedded solutions as "**Device Assisted Services (DAS) for protecting network capacity**" that rely on the **wireless end user device** to determine whether certain network signals are wasteful and block them accordingly. *Id.* 11:15-12:27. And unlike prior art device-centric approaches, which involve inefficient

repetitive signaling designed to "sav[e] device resources [] rather than network resources" (*id.* at 8:57-9:22), the inventors provided solutions that benefit the device *and* reduce network congestion, by blocking background app requests before they ever reach the network. For example, "before a connection is allowed to be opened (e.g., before a socket is opened), transmission, or a flow/stream is initiated, *it is blocked.*" *Id.* at 91:41-49. Further, "the network service usage control policy is dynamic based on one or more of the following … *a power state of device* … monitoring the power consumption behavior of the service activity, modem power cycling or *power control state changes.*" *Id.* at 84:35-53. And "[a]dvantageously, the differential network access control engine can restrict network access of a particular service usage activity when a condition is satisfied, such as when the service usage activity is a *background activity.*" *Id.* at 102:12-15.

These advances are explicitly recited by claim 1 itself. And were there any doubt about whether the claimed advances, even a cursory review of the file history would resolve it. In the examiner's stated reasons for allowance, she emphasized the portion of the claim she believed was missing from the prior art, identifying at least one of the claimed advances, as shown at right. Ex. A ('076 FH) at 6. Defendants ignore this entirely.

> None of the prior art disclose a wireless end-user device, comprising: a WWAN modem to communicate data for Internet service activities between the device and at least one WWAN, when configured for and connected to the at least one WWAN; and one or more processors configured to, for a time when data communication for Internet service activities is provided by the WWAN modem and the at least one WWAN, *classify whether* a first end-user application associated with an Internet access request, and capable of both interacting with a user in a user interface foreground of the device, and at least some Internet service activities when not interacting with a user in the device user interface foreground, *is interacting with the user in the device user interface foreground,* and allow or disallow the Internet access request *based on the classification as to whether the first end-user application is interacting with the user and based on a power control state, such that when the power control state is a first power control state and the first end-user application is classified as not interacting with the user,* the Internet access request is disallowec, and when the power control state is at least one other power control state, the Internet access request is allowed.

This specific way of configuring the wireless user device achieves the benefits of the invention, network congestion and wasteful power consumption. And because those benefits solve technology-specific problems of the wireless device and wireless network, the claims here are not abstract as a matter of law. *Uniloc*, 957 F.3d at 1309.

Indeed, the Federal Circuit has repeatedly found analogous claims to be non-abstract and eligible. For instance, in *Packet Intelligence LLC v. NetScout Systems, Inc.*, the Court found that

RUSS, AUGUST & KABAT

the intrinsic record made clear "that the claimed invention presented a technological solution to a technological problem" and the claims were thus patent-eligible as a matter of law. This was because "the focus of the claims is a specific improvement in computer technology: a more granular, nuanced, and useful *classification of network traffic*." 965 F.3d 1299, 1309-10 (Fed. Cir. 2020). Likewise, in *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, the Court reversed a ruling that the challenged claims were abstract, holding instead that the claims "are directed to a non-abstract improvement in an existing technological process (i.e., error checking in data transmissions)" in wireless devices. 942 F.3d 1143, 1150 (Fed. Cir. 2019). And in *Core Wireless Licensing S.A.R. L. v. LG Elecs., Inc.*, the Court held patent eligible claims directed to an improved user interface on a wireless device that "enabled users to more quickly access stored data and programs in small-screen electronics" by determining, for instance, when an application was in the background. 880 F.3d 1356, 1359-63 (Fed. Cir. 2018). Likewise, in the *Droplets, Inc. v. Yahoo!, Inc.* case, this Court held that the asserted claims were directed to the "idea of storage and provision of an interactive link capable of restoring a user's particular application operating state." No. 12-cv-03733-JST, Dkt. No. 1165, at 4 (N.D. Cal. Aug. 25, 2022). The Court held the claims were not abstract because they did not merely "recite the performance of some [] practice from the pre-Internet world along with the requirement to perform it" using a computer. *Id*. "Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id*. The intrinsic record confirms the same in this case: claim 1 is patent-eligible as a matter of law.

**B.    Defendants' Arguments Fail as a Matter of Law and the Factual Record**

"We have previously cautioned that courts must be careful to avoid oversimplifying the claims" by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc, v. Bandai Namco Games Am.,* 837 F.3d 1299 (Fed. Cir. 2016) (reversing district court for accepting an oversimplification of the claims under Step One). After all, any claim can look abstract if you divorce it entirely from the requirements set forth in the claim itself. Defendants' entire Step One analysis flatly contradicts this controlling law. Their argument that the over two hundred words in the claim are "directed to" a two-word phrase ***not*** in the claim—

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT

namely, "screening requests"—is fatally flawed.

        **1.**        **Defendants' premise that claim 1 is directed to "screening requests" is legal error as it ignores the claim language and claimed advance.**

The Federal Circuit has time and again stressed that, in conducting the Step One inquiry, we "must focus on the language of the Asserted Claims themselves." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016). Defendants violate this from the outset by ignoring *all the claim elements* and over-simplifying the claims to derive their statement of what the claims are directed to (i.e., "screening requests"). This two-word phrase is found nowhere in the claim, showing the motion should be denied. *Id*.

Defendants also violate controlling law by omitting the claimed advance in their Step One analysis. Nor could they, because a Step One summary of "screening requests" could not possibly capture the claimed advance here. And tellingly, Defendants fail to consider the Examiner's reasons for Allowance or the relevant parts of the claim. They ignore the specific way—taught and claimed—for reducing unnecessary network signaling by determining when the device is in a particular power control state with an application not interacting with the user in the foreground.

By ignoring the claimed advance, Defendants grossly oversimplify the claims to something they bear virtually no resemblance to. Defendants' two-word summary does not even sufficiently describe the *field of the invention*. Nor does it compare to the *title* of the '076 patent: "*Wireless end-user device with power-control-state-based wireless network access policy for background applications*." Thus, far from meeting the requirement of including the "focus" by using *some* claim language, Defendants do not distinguish the claim here from claims concerning disparate other *fields*, such as parents screening requests for candy or a receptionist screening visitors.

        **2.**        **Contrary to Defendants' assertions, claim 1 cannot plausibly be performed by the mind of a human "executive assistant."**

When you remove all the burdens of the actual claim language (as Defendants have done for Step One), you open the door to countless potential analogies that arguably "screen[] requests." Defendants run with "people requesting access to the executive mak[ing] a request through the executive's assistant" as their irrelevant analogy. Mot. at 9-11. But this analogy is not remotely plausible. Put simply, "people requesting access to the executive mak[ing] a request through the

HEADWATER'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER § 101

executive's assistant" has nothing to do with the claims and bears no resemblance to the intrinsic record here. There is no "human activity" analogy for the claimed advance here. As with *DDR Holdings*, *Core Wireless*, and other cases, there is no longstanding analog to these claims.

Based on the "executive assistant" analogy, Defendants argue that the claims here can be performed by the "human mind." Mot. at 7-12.  This is incorrect. Obviously, no human mind can selectively block WWAN Internet access requests by a mobile device application based on a power control state and a determination that the application *is not interacting with the user in the device's foreground*. In fact, a human mind is *incapable* of doing these things, at least because users do not even know these network requests are occurring in the background and have no way to detect them. The Federal Circuit rejected a similar argument in *SRI International, Inc. v. Cisco Systems, Inc*., where the court upheld as patent-eligible a claim reciting "network connection requests" and "network connection denials," explaining that such activities are "not the type of human activity that § 101 is meant to exclude." 930 F.3d 1295, 1301, 1304 (Fed. Cir. 2019) ("Indeed, we tend to agree with SRI that the human mind is not equipped to detect suspicious activity by using network monitors and analyzing network packets as recited by the claims.").

As in *SRI*, Defendants' Section 101 argument here fails at Step One. The technical problem (*wasteful signaling causing device-battery drainage and wireless network congestion*) and the claimed technical solution (*selectively disallowing WWAN Internet requests by an application based on a power control state and determining the application is not interacting with the user in the foreground)* are both unique to wireless end-user devices and the networks with which they communicate. Defendants never even acknowledge this critical point, nor do they account for the intrinsic record proving that the claims are directed to specific wireless mobile device solutions to specific problems arising only in that same technical field. Though they ignore the file history and specification statements referenced in this brief, Defendants suggest they do consider the intrinsic record and refer to the factually distinguishable and non-precedential *Broadcom* decision. Mot. at 15. Among other distinctions, the intrinsic record here describes improvements to the wireless device. And at any rate, it "is not enough, however, to merely trace the invention to some real-world analogy." *Data Engine Techs. LLC, v. Google*, *LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018).

12

RUSS, AUGUST & KABAT

Defendants do not and cannot meet their burden here.

### 3.    Claim 1 does not merely recite an aspirational result; it specifically improves wireless user devices and associated networks.

Defendants also assert that the detailed claims here are merely functional and do not provide any specificity on how to perform patent-eligible activity. Mot. at 11-14. Not so. Claim 1 specifies how and when the Internet access request from the first application is allowed or disallowed (e.g., disallowed when the power control state is a first power control state and by classifying if the application is not interacting with the user). Even assuming counterfactually that disallowing / allowing Internet access request is a "result" (and not a "how"), claim 1 explains how this result is achieved (by classifying application activities and assessing a power control state).

Defendants argue this case is like *Ericsson Inc. v. TCL Communication Techs. Holdings Ltd.*, 955 F.3d 1317 (Fed. Cir. 2020). Mot. at 11-13. But *Ericsson* is plainly distinguishable. First, as the table below shows, the claim in *Ericsson* was broadly directed to "access" to some general "platform." In sharp contrast to the claims here, the *Ericsson* claim says nothing about the factors, if any, used to decide whether and when access is denied. *Id.* at 1325-26.

| '076 Patent Claim 1 | *Ericsson* Claim |
|---|---|
| A wireless end-user device comprising: | A system for controlling access to a platform[,]comprising: |
| *classify whether a first end-user application associated with an Internet access request*, and capable of both interacting with a user in a user interface foreground of the device, and at least some Internet service activities when not interacting with a user in the device user interface foreground, *is interacting with the user in the device user interface foreground*, and | a platform having a software services component and an interface component, the interface component having at least one interface for providing access to the software services component for enabling application domain software to be installed, loaded, and run in the platform; |
| *allow or disallow the Internet access request* based on the classification as to whether the first end-user application is interacting with the user and based on a power control state, such that | an access controller for controlling access to the software services component by a requesting application domain software via the at least one interface, the access controller comprising: |
| | an interception module for receiving a request from the requesting application domain software to access the software services component; |
| *when the power control state is a first power control state and the first end-user application is classified as not interacting with* | and a decision entity for determining if the request should be granted wherein the decision entity is a security access manager, the security |

RUSS, AUGUST & KABAT

| '076 Patent Claim 1 | *Ericsson* Claim |
|---|---|
| ***the user, the Internet access request is disallowed***, and<br><br>when the power control state is at least one other power control state, the Internet access request is allowed. | access manager holding access and permission policies; and<br>wherein the requesting application domain software is granted access to the software services component via the at least one interface if the request is granted. |

Unlike the claims here, which recite that an "Internet access request" is allowed or disallowed "*based on the classification as to whether the first end-user application is interacting with the user and based on a power control state*," the *Ericsson* claim said nothing about ***how*** the decision entity / security access manager makes its decisions. *Id.* Thus, the *Ericsson* claim did not provide any details on what inputs were analyzed to "deny access." Moreover, the Federal Circuit held in *Ericsson* that the four components in the claim "collapse[d] into simply 'an access controller for controlling access' by 'receiving a request' and then 'determining if the request should be granted.'" *Id.* Here, claim 1 is far more detailed, and even provides decision logic, compared what the *Ericsson* claim actually said (according to the Federal Circuit). Further, the *Ericsson* claim was not limited to any type of device, and the Court admonished Ericsson for suggesting it was limited to mobile phones. Here, in contrast, claim 1 recites a "wireless end-user device." These are just some of the sharp contrasts between *Ericsson* and the '076 patent in this case. And they confirm that Defendants' arguments fail at Step One.

## C.    *Alice* Step Two: Defendants Cannot Show Claim 1 Lacks Inventive Concepts

While Step Two should not be reached here, Defendants' arguments at Step Two likewise fail because claim 1 recites an unconventional wireless device as of the time of the invention.

### 1.    The intrinsic evidence confirms that claim 1 is inventive.

The '076 specification confirms that claim 1 provides an unconventional solution to the problem of managing network capacity. As the patent explains, "[n]etwork carriers have typically attempted to manage network capacity using various purely central/core network based approaches." '076 patent at 9:23-25. But such "[p]urely centralized network solutions with no assistance from a device-based software agent (or service processor) *can have several limitations*." *Id.* at 9:27-30. For example, these limitations include:

- if service usage activity is blocked in the network behind the base station, OTA bandwidth is still consumed to open a communication socket, and network capacity/resources are wasted without completing data transfer (*id.* at 9:31-37);

- if the service usage activity is aggressive in re-attempting to establish the network connection, a large amount of capacity can be consumed by many devices even though no useful service is being allowed (*id.* at 9:37-44); and

- when service usage activity is blocked by the central network without informing the user, this can lead to a frustrating user experience (*id.* at 9:51-59).

The '076 patent teaches that it is desirable to protect network capacity "by controlling network service usage activities at the source of the demand—the device." *Id.* at 9:44-46. It is also desirable to control service usage "in a manner that delays, prevents, or reduces the frequency of service usage activity re-try attempts to connect to the network." *Id.* at 9:46-50. Both are captured by the claimed invention, which is a system for protecting network capacity located entirely on the wireless user device itself. By blocking activity "at the source," problems and inefficiencies associated with the network (e.g., establishing connection and re-try attempts) are avoided. Putting the control mechanism on the device also offers other advantages, such as allowing the system to consider the device's power control state and the application's foreground/background state. Both are part of the claimed advance and managing network activity more effectively. *Id.* at 8:23-40.

### 2.   Defendants' arguments fail on the law and facts.

To argue that the claims include no inventive concept, Defendants parse out and analyze each of five claim elements, *one at a time*. Defendants first isolate "classifying" from the rest of the claim and argue it was known and conventional—and then perform the same analysis for the term "allowing or disallowing," followed by "wireless end-user device," then "modem," and finally "one or more processors." Mot. at 16-17. This is improper. The Step Two inquiry requires considering *all* claim elements—and requires considering the entire claim *as an ordered combination*. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1307 (Fed. Cir. 2019).

The reason for this bright-line rule is clear. If one were to isolate claim elements and take them one at a time, then countless computer patents would be seen as conventional because they recite existing components that are used in an unconventional way to provide an improvement in that technological field. A claimed invention's compatibility with conventional systems does not

render it ineligible. *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020). Here, the combination of elements results in an unconventional wireless user device, and the components thereof work in an unconventional way. This is apparent from the "processor" term.

Defendants assert the processor's functions of "classifying" and "allowing/disallowing" are "well-understood, routine, and conventional activities that previous processors could perform." Mot. at 16. In doing so, Defendants improperly consider each function in isolation and mischaracterize the specification, which *never* says the claimed configuration was conventional.

Defendants first assert that "the function 'classifying' is something conventional devices already performed." *Id*. But claim 1 doesn't recite just "classifying"—it recites a processor in a wireless user device *classifying whether an application is interacting with the user in the device's UI foreground* and then allowing/disallowing an Internet service request. There is no evidence any conventional processor did that. Indeed, Defendants cite this excerpt, undermining their argument:

> Traditionally, mobile devices typically have *specialized designs* that are optimized to preserve network capacity and protect network resources from being over taxed. For example, wireless devices that browse the Internet often use *specialized protocols such as WAP and data traffic compression or low-resolution techniques* rather than standard HTTP protocols and traffic used in wired Internet devices.

'076 patent at 4:22–28 (cited at Mot. at 16:14). This distinguishes the claimed inventions from traditional mobile devices that required "specialized protocols such as WAP and data traffic compression or low-resolution techniques" for accessing the Internet. And in the next paragraph, the patent describes drawbacks of prior approaches as requiring "time consuming design, testing, and certification processes." *Id.* at 4:33-35. The claimed invention avoids the need for "specialized designs" to protect network capacity, and there is no evidence traditional wireless-device processors classified by foreground/background as recited in claim 1. Nor does the patent state, as Defendants suggest, that existing WAP stations did that. Mot. at 16. The statement Defendants cite is about classifying network service usage into "one or more service classes"—*not* classifying the application as interacting with the user in the device UI foreground. '076 patent at 97:32-35. In any event, the Examiner clearly concluded that this claimed feature was not conventional. Ex. A at 6. At a minimum, there are factual disputes here that preclude adjudication at this early stage.

Defendants next assert that the function of "allowing or disallowing" is a "well-known traffic control technique." Mot. at 16 (citing '076 patent at 13:21-25). In fact, this passage does **not** say that "block/allow" is a well-known technique. Rather, this passage **distinguishes** "block/allow" from "traffic control techniques, such as throttle, delay, priority queue, time window, suspend, quarantine, kill, remove, and other well known traffic control techniques." *Id.* at 13:21-25. Moreover, Defendants ignore that claim 1 recites allowing/disallowing *Internet access requests* based on (1) the prior classification and (2) the power control state. There is no evidence that *the specifically claimed "allowing or disallowing"* was conventional.

Accordingly, there is no basis to "strip[] away" the claimed functions of the processor and treat claim 1 as merely a "wireless end-user device" with a "modem" and "processors." *Id.* at 16. Yet that is what Defendants seek to do. Claim 1 recites an unconventional and inventive configuration of a processor that improves a wireless user device and its WWAN functionality. The specification does not remotely "admit" this was conventional as of the invention. Nor do Defendants provide any evidence, much less clear and convincing, that claim 1 is conventional.

### 3.   Claim 1 sets forth "how" the steps are performed.

Unable to provide evidence that claim 1 is wholly conventional, Defendants pivot to a misguided enablement argument. Relying on *Electric Power*, Defendants assert that (1) the Step Two inquiry turns on claim 1's specific requirements for "*how* the desired result is achieved" and (2) there are no such requirements here. Mot. at 17. Defendants are wrong on both counts.

This is not the kind of "situation" where more detail in the claims was required, as was the case in *Electric Power*. There, the claims were akin to "ordinary mental processes"; they did not require any "arguably inventive set of components or methods," nor did they "invoke any assertedly inventive programming." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016). Here, claim 1 describes a wireless user device with a claimed configuration that cannot be performed mentally, at least because human beings cannot detect Internet access requests from applications not in the device user interface foreground. The claim *does* require an inventive set of components and methods and *does* invoke inventive programming. *Electric Power* is therefore inapposite and cannot support Defendants' arguments under Step Two (or Step One).

In any event, claim 1 satisfies Defendants' demand for "*how* the desired result is achieved." Claim 1 recites *what* is classified (an application associated with an Internet access request) and *what* the classification is (whether the application is interacting with the user in the device UI foreground). And claim 1 recites *how* and *when* to allow or disallow the Internet access request: it is *disallowed* when the power control state is a first power control state and the application is not interacting with the user, and *allowed* when the power control state is another power control state.

### 4.    Claim 1 is inventive under *BASCOM*.

The Federal Circuit's decision in *BASCOM* is particularly instructive and demonstrates that claim 1 is inventive. In *BASCOM*, the Court analyzed a claim for a "content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts" including "a local client computer" and "an ISP server," which, in isolation, were conventional. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016). Despite this, the Federal Circuit held that the ordered combination of elements included an inventive concept, which was described and claimed as "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user. This design gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server." *Id.* at 1350. The court further held that "the claims ... do not preempt the use of the abstract idea of filtering content on the Internet or on generic computer components performing conventional activities." *Id.* at 1352.

The same reasoning applies to claim 1 here. The inventive concept in *BASCOM* was to move filtering functionality from the client to the server. Similarly (in reverse), one inventive concept here was to move network service control functionality from the centralized/core network (the server) to the wireless user device (the client). '076 patent at 9:23-59 (distinguishing "[p]urely centralized network solutions with no assistance from a device-based software agent from "controlling network service usage activities at the source of the demand—the device."). This avoids certain drawbacks and allows additional device-side control parameters (power control state and application foreground) to be considered. For purposes of Step Two, this is equivalent to the inventive concept the Federal Circuit found eligible in *BASCOM*. *See VidStream, LLC v. Twitter,*

*Inc.*, No. 3:16-CV-0764-N, 2022 WL 992743, at *5 (N.D. Tex., Apr. 1, 2022) ("[T]he inventive concept in *BASCOM* was to move customizable filtering from the client to the server. The claims here do that in reverse. The inventive concept here is to move video format compatibility enforcement from the transcoder on the server to the video capture process on the client. The Court cannot meaningfully distinguish the proffered inventive concept here from the inventive concept the Federal Circuit found to be patent-eligible in *BASCOM*.") (denying motion to dismiss).

Claim 1 is patent-eligible. At minimum, the facts here—which must be accepted as true and contradict Defendants' conventionality argument—raise factual disputes precluding dismissal. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126-28 (Fed. Cir. 2018).

### D.   Defendants Also Fail to Show Ineligibility for Any Other Claim

Claims 2-16 are likewise patent-eligible. Defendants notably do not assert that claim 1 is "representative" of claims 2-16, by failing to make, much less support, any contention about representativeness. Headwater agrees that claim 1 is not representative. *See Berkheimer*, 881 F.3d at 1366-70 ("A claim is not representative simply because it is an independent claim.") (vacating summary judgment of ineligibility for dependent claims 4-7 as they contained limitations tied to the inventive concept described in the specification). Defendants present two cursory sentences about claims 2-16 followed by a bare assertion that all claims are "substantially similar" to claim 1 and "likewise ineligible." Mot. at 18. This entirely fails to meet Defendants' burden under both *Alice* steps. Defendants' motion as to claims 2-16 should be denied for this reason alone.

Indeed, claims 2-16 contain additional requirements that are material to patent-eligibility and undermine Defendants' arguments raised for claim 1. Claims 2-4 contain additional details about how the processors are configured to "classify" whether the application is interacting with the user in the foreground. They further discredit (1) Defendants' characterization of "classifying" as merely one of higher / lower priority, contrary to the claim language, and (2) Defendants' criticism that the claim fails to recite "how" the classification is performed. Claims 10-12 contain limitations about the power control state being a "power state of the device," "power save state of the device," or "power state of the WWAN modem." They further tie the claims to a specific hardware power state and undermine Defendants' characterization of power control state as "how

RUSS, AUGUST & KABAT

likely to lead to repeated requests." Mot. at 18. Claims 5 and 15 contain additional details about queuing requests "until a power control stage change occurs" and preventing the request "from causing a change to the power state of the modem." They relate to the specific technical problem of device power state changes affecting network resources/performance, as discussed in the patent. '076 patent at 7:42-62. Claims 13 and 14 recite limitations that "dynamically change" whether to allow/disallow the access request based on a "device usage state" or "power control state changes for the WWAN modem." They further show the requests are processed dynamically by the processor based on varying hardware conditions and cannot be performed mentally by a human.

## V.     THE '700 PATENT CLAIMS ARE ALSO ELIGIBLE UNDER 35 U.S.C. § 101

### A.     *Alice* Step One: Claim 1 Is Not Directed to an Abstract Idea

#### 1.     Claim 1 is directed to improvements in a wireless user device and wide area network and is, therefore, patent-eligible.

Claim 1 of the '700 patent is directed to a wireless user device with (1) an activity classifier for dynamically associating network access policy controls with each application, (2) an API callable by each application to request an execution time according to the network controls, and (3) a launch manager to schedule execution times for each application according to the network controls. The claim addresses the problem of certain types of "device service activity" that substantially drain network capacity / performance. '700 patent at 8:9-12 (activity from always-connected, data-intensive applications), 8:29-38 (activity from background applications, e.g., software updates). Claim 1's solution is to classify these background activities with the activity classifier[2] and then the launch manager uses the API to select corresponding execution times for these activities according to the network access policy controls. As the specification explains:

- "before a given device application, process, function, OS service or other service activity is allowed to start, the intention to start is intercepted by a launch manager,

---

[2] A POSITA would understand that the "activity classifier" associates applications in accordance with the activities discussed in the specification, i.e., background activities. By contrast, Defendants contend that the modifier "activity" in the phrase "activity classifier" adds no limitation on claim scope and, accordingly, argue that the claim provides no indication of how the association of applications and policies is performed. Mot. at 24. As such, the Court deserves a full claim construction record to decide these issues. *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1380 (Fed. Cir. 2019) ("Nevertheless, the district court's failure to address the parties' claim construction dispute is error under *Aatrix Software*, 882 F.3d at 1125.")

RUSS, AUGUST & KABAT

the background service policy set or the network protection service policy set for the service activity is retrieved, and any necessary user notification or service launch control policies are implemented prior to allowing the service activity to launch." *Id.* at 66:38-45.

- "techniques are needed to preserve network capacity by, for example, differentially controlling these types of network service usage activities in various ways depending on the type of service activity requesting network access and/or requesting transactions with network resources." *Id.* at 8:57-62.

- "techniques are provided for classifying network service activities associated with one or more applications or OS functions to a background service class and differentially controlling the background service class traffic." *Id.* at 12:26-30.

Further, an "API" is used to "provid[e] instructions for differential access to a network." *Id.* at 74:59-63. And while there is no clear statement from the file history, the specification makes clear that differential network access control engine can restrict network access of a particular service usage activity when a condition is satisfied, such as when the activity is a "background" activity.

Thus, the '700 patent confirms that this specific way of configuring the wireless user device—namely, with applications that request, *through an API*, execution times according to network access policy controls, and *a launch manager to schedule corresponding execution times according to the same network access policy controls*—will achieve the stated benefits of the invention. And because those benefits improve on technology-specific problems of the wireless device and wireless network it communicates with, claim 1 is not abstract as a matter of law. *Uniloc*, 957 F.3d at 1309. Again, the Federal Circuit has found analogous claims to be not abstract and, therefore, patent-eligible. For instance, in *Packet Intelligence*, the Court found that claims the intrinsic record made clear "that the claimed invention presented a technological solution to a technological problem" and was thus patent-eligible as a matter of law. This was because "the focus of the claims is a specific improvement in computer technology: a more granular, nuanced, and useful *classification of network traffic*." 965 F.3d 1299, 1310 (Fed. Cir. 2020). Likewise, in *Koninklijke,* the court reversed a ruling that the challenged claims were abstract because the Court found the claims "are directed to a non-abstract improvement in an existing technological process (i.e., error checking in data transmissions)" in wireless devices. 942 F.3d 1143, 1150 (Fed. Cir. 2019). The intrinsic record confirms the same in this case—claim 1 is patent-eligible.

2. **Defendants' step one assertion—that claim 1 is directed to "scheduling activities"—is fatally flawed.**

Defendants' step one assertion for the '700 patent suffers from the same oversimplification errors they committed for the '076 patent. Defendants fail to properly summarize what the claim 1 is "directed to" by failing to acknowledge the intrinsic record's claimed advance—and again failing to use *any of the claimed requirements*. Instead, they resort to another, similar two-word phrase: "scheduling activities." This fails because it bears no resemblance to these technical claims. Instead, Defendants' claim-to-analogy comparison only confirms their error. Neither "scheduling activities," nor Defendants' analogy distinguishes this patent from *any* others in the same technical field. Therefore, it cannot be right.

Later, Defendants' shift to a much different characterization of the claim. They point out that claim 1's three key components "serve to (1) associate rules with applications, (2) receive requests from the applications to schedule activities according to the rules for that application, and (3) schedule activities for each application according to those rules." Mot. at 20. Even this bare-bones view comprises much more than their directed to assertion of "scheduling activities. And that bare-bones, three-part summary *still* fails to include *any mention* of the key configuration innovation of the claim—to use network policies to do all this—and make sure the requests and other actions are taken and *executed through the API*. And this view also fails to include *any mention* of the key innovation of the claim: a configuration of the wireless user device that classifies and schedules each application according to activity type and therefore dramatically improves the functioning of the wireless device and network. These are key considerations—and Defendants' attempt to avoid them only demonstrates that their motion should be denied.

Moreover, the technical problem (*wasteful access by certain activities and applications and overloading the wireless network*) and the claimed technical solution of the '700 patent were both unique to wireless end-user device and the networks with which they communicate. Defendants never acknowledge, let alone grapple with this critical point. And they likewise never address the intrinsic record that shows the claim is directed to specific wireless mobile device solutions to specific problems arising only in that same technical field. That fails, just like the analogy. At any rate, the Court has warned that it "is not enough, however, to merely trace the

1

invention to some real-world analogy." *Data Engine Techs.*, 906 F.3d at 1011.

2

Defendants are plainly wrong that the claim here can be performed by the "human mind."

3

Mot. at 7–12. They provide no evidence for this, and none is necessary to reject the argument. No

4

"human mind" has ever performed even the claimed advance here—and *SRI International, Inc. v.*

5

*Cisco, Systems, Inc.*, refutes the applicability to the claim here. Defendants again rely on the

6

inapposite *Ericsson* case but that fails for the reasons discussed for the '076 patent. The

7

*RingCentral* and *24/7 Customer* cases Defendants cite involved patents that are even further afield

8

than *Ericsson*. Those claims provided no known technical improvement to computer technology,

9

let alone improvements to a wireless user device and WWAN functionality. The cases are

10

distinguishable on other grounds as well. At bottom, the claims here are directed to a technical

11

solution to a technical problem, as the intrinsic record confirms. They are patent-eligible.

12

**B.**   *Alice* **Step Two: Defendants Cannot Show Claim 1 Lacks Inventive Concepts**

13

While Step Two should not be reached here, Defendants' arguments at Step Two likewise

14

fail because claim 1 recites an unconventional wireless user device as of the time of the invention.

15

Claim 1 recites a wireless user device with the ordered combination of: (1) an activity classifier

16

for dynamically associating network access policy controls with applications, (2) an API callable

17

by applications to request execution times according to network access policy controls, and (3) a

18

launch manager to schedule execution times for each application according to such policy controls.

19

Defendants again parse out each element of the claim in isolation. But even so, they fail to

20

show each element is conventional, let alone the ordered combination. Defendants refer to a

21

mention of "traditional" mobile devices in column 4 of the patent. Mot. at 23. But as discussed for

22

the '076 patent, this excerpt is drawing a distinction between the claimed inventions and *alternate*

23

*approaches* that require "specialized protocols such as WAP and data traffic compression or low-

24

resolution techniques" that are unrelated to activity classification or launch management via API.

25

Defendants also cite a "time window" as a known traffic control. *Id.* at 23-24 (citing '700 patent

26

at 13:26-42). But this does not remotely suggest that the *claimed steps* are conventional.

27

Defendants also fail to address the ordered combination, violating Step Two. In *BASCOM*,

28

for example, the Federal Circuit found the claim at issue recited "generic computer, network and

RUSS, AUGUST & KABAT

Internet components, none of which is inventive by itself." *BASCOM*, 827 F.3d at 1350. Nor did the patentee invent "filtering." *Id.* Nevertheless, the Federal Circuit reversed because the overall claim contained an inventive concept: "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Id.*

Likewise, here, the ordered combination of claim 1 is inventive, for at least two reasons. *First*, as discussed for the '076 patent, claim 1 of the '700 patent recites the inventive concept of controlling network service usage *on the wireless device itself*, as opposed to "centralized" control mechanisms located on the network. *See* '700 patent at 9:30-46, 9:51-59, 10:9-16, 11:15-12:27. Placing control mechanisms on the device avoided inefficiencies associated with network connection and re-connection and provides additional advantages, such as more granular and flexible control from the device itself, as illustrated by the invention of claim 1. *Id.* The inventive concept in *BASCOM* was to move filtering functionality from the client to the server. Claim 1 provides a similar inventive concept in reverse: moving network service control functionality from the centralized / core network (the server) to the wireless user device (the client). *Id.*

*Second*, claim 1 contains the inventive concept of controlling network service usage **at the application level** and provides a specific way of doing that. As the specification notes, centralized network solutions had "no assistance from a device-based software agent (or service processor)." *Id.* at 9:27-30. At the same time, the inventors recognized that specific application activities had enormous and disproportionate impact on network capacity / performance. *Id.* at 8:9-24. Thus, a system that could use device-based assistance (such as APIs) and associate and control network usage on an application-by-application basis would be highly desirable. *See id.* at 10:16-23 ("*What is needed*" is intelligent network monitoring to provide real-time traffic monitoring network service usage at the "application level/layer"); *id.* at 65:12-66:19 (describing "launch intercept manager" which applies "*before* [an] application [] activity is allowed to start"); *id.* at 92:36-49 ("application/messaging layer (e.g., a network API as described herein) is used"). Such a solution is in claim 1, which recites associating network access policy controls *with each application* and scheduling execution times for each application *via an API* according to those controls.

To the extent these aspects are not dispositive, at a minimum they raise factual disputes on

RUSS, AUGUST & KABAT

conventionality of the ordered combination of elements, precluding adjudication at this early stage.

### C.   Defendants Also Fail to Show Ineligibility for Any Other Claim

Claims 2-20 are likewise patent-eligible. As with '076, Defendants do not assert that claim 1 is "representative" of claims 2-20, and Headwater agrees it is not. And as before, Defendants' bare assertion that all claims are "substantially similar" to claim 1 fails to meet their burden under both *Alice* steps. Mot. at 24. The motion should be denied as to claims 2-20 for this reason alone.

Claims 2-20 contain additional requirements material to patent-eligibility. For instance, claims 2-5 provide additional details about *how* the "activity classifier" makes its determinations, *e.g.*, that an activity is a "a blocked activity based on a lack of user interaction" or a "non-controlled activity based on a user's current user interaction with that application" or the "application currently providing a foreground service." Further, claims 12-14 and 19 contain additional details about how the system "dynamically associates" network access policy controls to applications, *e.g.*, changing the association "based on a power state of the device" (claim 12), "based on a device usage state" (claim 13), and "based on a change in a current network to which the at least one wireless modem is providing network access" (claim 14). Claim 19 recites dynamically changing the association "based on an amount of network data communicated to or from a given one of the executable applications." The foregoing claims undermine Defendants' characterization of the claims as merely "scheduling activities." To the contrary, the claimed associations are performed by a computer system based on varying hardware or software conditions and cannot be performed mentally by a human. Further, the conditions (such as a power state change or application-activity) relate to specific problems affecting network resources / capacity as discussed in the specification. As another example, claim 11 recites a "user interface allowing a user to specify one or more of the network access policy controls to be associated with" a given application. This places more network controls on the wireless device (as opposed to in the network), allowing the user to set and understand what network access controls are applied. *See* '700 patent at 9:57-10:5.

### VI.   CONCLUSION

Thus, the motion should be denied in its entirety. And if the Court is inclined to grant any part of it, Headwater should be given leave to amend its pleadings. *Aatrix*, 882 F.3d at 1126.

RUSS, AUGUST & KABAT

1   Dated: March 27, 2024                    Respectfully submitted,

2                                            */s/ Marc Fenster*
                                             Marc Fenster (SBN 181067)
3                                            Email: mfenster@raklaw.com
                                             Reza Mirzaie (SBN 246953)
4                                            Email: rmirzaie@raklaw.com
                                             Brian Ledahl (SBN 186579)
5                                            Email: bledahl@raklaw.com
                                             Ben Wang (SBN 228712)
6                                            Email: bwang@raklaw.com
                                             Paul Kroeger (SBN 229074)
7                                            Email: pkroeger@raklaw.com
                                             Neil A. Rubin (SBN 250761)
8                                            Email: nrubin@raklaw.com
                                             James S. Tsuei (SBN 285530)
9                                            Email: jtsuei@raklaw.com
                                             Philip Wang (SBN 262239)
10                                           Email: pwang@raklaw.com
                                             Amy Hayden (SBN 287026)
11                                           Email: ahayden@raklaw.com
                                             Jason M. Wietholter (SBN 337139)
12                                           Email: jwietholter@raklaw.com
                                             Kristopher Davis (SBN. 329627)
13                                           Email: kdavis@raklaw.com
                                             **RUSS AUGUST & KABAT**
14                                           12424 Wilshire Boulevard, 12th Floor
                                             Los Angeles, California 90025
15                                           Telephone: (310) 826-7474
                                             Facsimile: (310) 826-9226
16
17
18                                           *Attorneys for Plaintiff,*
                                             *Headwater Research LLC*
19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

4

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served this 27th day of March 2024, with a copy of this document via the Court's CM/ECF system.

5

*/s/ Marc Fenster*
Marc Fenster

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28