| | |
|---|---|
| 1 | Jacob A. Schroeder (SBN 264717) |
|   | jacob.schroeder@finnegan.com |
| 2 | **FINNEGAN, HENDERSON, FARABOW,** |
|   | **GARRETT & DUNNER, LLP** |
| 3 | 3300 Hillview Avenue |
|   | Palo Alto, CA 94304-1203 |
| 4 | Telephone:    (650) 849-6600 |
|   | Facsimile:    (650) 849-6666 |
| 5 | |
|   | Daniel C. Cooley (*pro hac vice*) |
| 6 | daniel.cooley@finnegan.com |
|   | Daniel M. Jordan (*pro hac vice*) |
| 7 | dan.jordan@finnegan.com |
|   | **FINNEGAN, HENDERSON, FARABOW,** |
| 8 | **GARRETT & DUNNER, LLP** |
|   | 1875 Explorer Street, 8th Floor |
| 9 | Reston, VA 20190-6023 |
|   | Telephone:    (571) 203-2700 |
| 10 | Facsimile:    (571) 203-2777 |
| 11 | Andrea G. Mills (*pro hac vice*) |
|   | gracie.mills@finnegan.com |
| 12 | **FINNEGAN, HENDERSON, FARABOW,** |
|   | **GARRETT & DUNNER, LLP** |
| 13 | 901 New York Avenue, NW |
|   | Washington, DC 20001-4413 |
| 14 | Telephone:    (202) 408-4000 |
|   | Facsimile:    (202) 408-4400 |
| 15 | |
| 16 | *Attorneys for Defendants* |
|   | *Motorola Mobility LLC and* |
|   | *Lenovo (United States) Inc.* |
| 17 | |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | | |
|---|---|---|
| HEADWATER RESEARCH LLC, | | Case No. 4:23-cv-04496-JST |
| Plaintiff, | | **DEFENDANTS MOTOROLA MOBILITY LLC AND LENOVO (UNITED STATES) INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)** |
| v. | | |
| MOTOROLA MOBILITY LLC AND LENOVO (UNITED STATES) INC., | | |
| Defendants. | | Date:       Thursday, April 18, 2024 |
| | | Time:       2:00 p.m. |
| | | Location:   Courtroom 6, 2nd Floor |
| | | Judge:      Hon. Jon S. Tigar |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT ..........................................................................................................................1

    A. The Claims Do Not Solve Any Technological Problem............................................1

        1. "Congestion" Is Not a Problem Specific to Wireless Networks...................1

        2. '076 Patent: The Claims Do Not Address Device Power Consumption .....3

        3. '700 Patent: The Claims Are Not Directed to Preventing Wasteful Access ................................................................................................................4

    B. The '076 Patent Is Ineligible Under 35 U.S.C. § 101 ..............................................4

        1. *Alice* Step One: Claim 1 Is Directed to an Abstract Idea.............................4

            a. The claimed process is the sort that can be performed in the human mind ..........................................................................................7

            b. The cases Plaintiff cites involved problems unique to computers .................................................................................9

        2. *Alice* Step Two: Claim 1 Includes No Inventive Concept .........................11

            a. Conventional processors could "classify" applications and "allow" or "disallow" requests for Internet access ........................11

            b. This case is distinguishable from *BASCOM* ..................................12

    C. The '700 Patent Is Ineligible Under 35 U.S.C. § 101 ............................................13

        1. *Alice* Step One: Claim 1 Is Directed to an Abstract Idea...........................13

        2. *Alice* Step Two: The Claims Include No Inventive Concept.....................14

    D. The Dependent Claims of the '076 and '700 Patents Are Likewise Ineligible .....15

III. CONCLUSION.....................................................................................................................15

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*24/7 Customer, Inc. v. LivePerson, Inc.*,
    No. 15-cv-02897-JST, 2017 U.S. Dist. LEXIS 81479 (N.D. Cal. May 25, 2017) ...................14

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018)...................................................................................................15

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016)...................................................................................................12

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)................................................................................................................4, 6

*Ancora Techs., Inc. v. HTC Am., Inc.*,
    908 F.3d 1343 (Fed. Cir. 2018)................................................................................................6, 7

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016)................................................................................6, 12–15

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
    880 F.3d 1356 (Fed. Cir. 2018)...............................................................................................9, 10

*Customedia Techs., LLC v. Dish Network Corp.*,
    951 F.3d 1359 (Fed. Cir. 2020)....................................................................................................2

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011)....................................................................................................7

*Data Engine Techs. LLC v. Google, LLC*,
    906 F.3d 999 (Fed. Cir. 2018)..............................................................................................10, 11

*Droplets, Inc. v. Yahoo Inc.*,
    No. 4:12-cv-03733-JST, Dkt. No. 1165 (N.D. Cal. Aug. 25, 2022)......................................9, 10

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)....................................................................................................7

*Ericsson Inc. v. TCL Commc'n Techs. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020).......................................................................................1, 5, 7, 8

*Intell. Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016)...................................................................................................10

*Koninklijke KPN N.V. v Gemalto M2M GmbH*,
    942 F.3d 1143 (Fed. Cir. 2019).......................................................................................9, 10, 14

ii

DEFENDANTS' REPLY ISO MOTION TO DISMISS
CASE NO. 4:23-CV-04496-JST

*Packet Intelligence LLC v. NetScout Systems, Inc.*,
    965 F.3d 1299 (Fed. Cir. 2020) ..................................................................................... 9, 10, 14

*PersonalWeb Technologies LLC v. Google LLC*,
    8 F.4th 1310 (Fed. Cir. 2021) ................................................................................................ *passim*

*Quad City Pat., LLC v. Zoosk, Inc.*,
    498 F. Supp. 3d 1178 (N.D. Cal. 2020) ............................................................................ 12, 14

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017) .......................................................................................... 10

*RingCentral, Inc. v. Dialpad, Inc.*,
    372 F. Supp. 3d 988 (N.D. Cal. 2019) ........................................................................ 8, 10, 14

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) .......................................................................................... 15

*Sneed v. Procter & Gamble Co.*,
    No. 23-cv-05443, 2024 U.S. Dist. LEXIS 41234 (N.D. Cal. Mar. 8, 2024) .......................... 14

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    930 F.3d 1295 (Fed. Cir. 2019) ............................................................................................ 8

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016) .......................................................................................... 12

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020) ............................................................................................ 3

*In re TLI Commc'ns LLC Pat. Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) ......................................................................................... 6, 11

*Universal Secure Registry LLC v. Apple Inc.*,
    10 F.4th 1342 (Fed. Cir. 2021), *cert denied*, 142 S. Ct. 2707 (2022) ...................................... 4

**Statutes**

35 U.S.C. § 101 ............................................................................................................ *passim*

## I. INTRODUCTION

At root, the '076 and '700 Patents are ineligible under 35 U.S.C. § 101 because they are directed to an abstract idea, rather than a technological solution to a technological problem, and the claim elements, taken individually or in combination, are routine and conventional. As Defendants' opening brief (Dkt. No. 54) ("Opening Br.") showed, the intrinsic record makes this clear, and nothing in Plaintiff's opposition (Dkt. No. 57) ("Opp.") rebuts this or raises any factual dispute. Defendants' motion should be granted.

## II. ARGUMENT

### A. The Claims Do Not Solve Any Technological Problem

#### 1. "Congestion" Is Not a Problem Specific to Wireless Networks

For both the '076 and '700 Patents, Plaintiff emphasizes a problem never mentioned in its Complaint, that of "a network capacity crunch" in which "increasing network congestion" will "overwhelm the network." Opp. 2 (emphasis removed), 5 ("similar technical problems"). Indeed, the Patents explain that the network can be "'overload[ed]' . . . with excess demand" and even "fall[] behind in servicing . . . demand." '076 Patent at 6:56–67. But this problem—congestion that results from being overloaded with demand and falling behind—is by no means specific to wireless networks.

Rather, this problem appears in any context where resources are demanded. A restaurant kitchen can be overloaded with demand for food and fall behind. A road can be congested with cars and get backed up. Or, as Defendants' opening brief analogized, an executive can be overloaded with demand for his time. In each of these contexts, common solutions include what the claims recite: As in the '700 Patent, restaurant hosts "schedule . . . according to . . . [a] policy" when, e.g., assigning reservation or pick-up times; and as in the '076 Patent, traffic cops "allow or disallow . . . request[s]" to let cars through based on criteria such as the current traffic. The executive's assistant does both, scheduling meetings and screening requests to prevent overloading the executive.

"Controlling access to resources," as the Patents do, "is pervasive in human activity, whether in libraries . . . , office buildings . . . , or banks." *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020). "In each of these circumstances," the Federal Circuit has

explained, "a request is made for access to a resource, that request is received and evaluated, and then the request is either granted or not." *Id.* The claims here do no more.

Plaintiff is wrong that "*network* congestion" is a technological problem "unlike human problems that existed before . . . wireless devices and networks." Opp. 8. An executive can be burdened with too many incoming requests for access, just as a network can be "burden[ed] . . . with too many" requests for access. *Id.* That the claimed requests are sent between computing devices, rather than humans, does not generate any meaningful difference with real-world requests for access to a resource.

The patentee in *PersonalWeb Technologies LLC v. Google LLC*, 8 F.4th 1310 (Fed. Cir. 2021) made similar arguments. There, the claim recited using "content-based values as a name or identifier" for data items to "control access to" and improve "retriev[al] and deliver[y]" of the data items. *Id.* at 1315–16. While recognizing that the claims "d[id] this in a computer environment," the court made a real-world analogy to librarians: "Librarians often locate books based on a 'call system' where they assign books unique identifiers based on call numbers . . . ." *Id.* at 1316 (citation omitted). In light of this analogy, the court found unpersuasive the patentee's assertion that the claims offered a technological solution. *Id.* at 1318. "Both the solution" of the claims and the "problems" they purported to solve "long predated computers" and were "not different in kind from those that would accrue in the [real-world] analogue." *Id.*

The same is true here. Certainly, the claims of the '076 and '700 Patents recite "[a] wireless end-user device" that can connect to a "network." '076 Patent at 105:50–54; '700 Patent at 107:33–35. But, as in *PersonalWeb*, the real-world analogies are apparent. And, as in *PersonalWeb*, both the solutions of the claims—scheduling activities and screening requests for access—and the problem they purport to solve—congestion—long predate wireless end-user devices and networks.

Finally, the user's experience relating to the applications' requests for access to the network is not a technological problem, nor is any improvement thereof a technological solution. Opp. 2, 3, 5. Changes in "a user's experience while using a computer application is not, without more, sufficient to render the claims directed to an improvement in computer functionality." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020).

2   DEFENDANTS' REPLY ISO MOTION TO DISMISS
CASE NO. 4:23-CV-04496-JST

### 2. '076 Patent: The Claims Do Not Address Device Power Consumption

Plaintiff alleges another problem the '076 Patent purportedly solves, also not mentioned in its Complaint: "**power consumption** of the wireless device itself." Opp. 2. But this problem is nowhere described in the passages of the '076 Patent that Plaintiff cites. Rather, these passages remain focused on "network resources." For example, one states that an "example of device service activity behavior that can have an impact on network performance is the way the device, device subsystem, and/or modem subsystem power cycling or transitions from one power save state to another." '076 Patent at 7:42–45 (cited at Opp. 2–3). But the problem that this "power cycling" causes, the '076 Patent explains, is the consumption of "*network resources*," not device power. As the '076 Patent states:

> [E]stablishing a basic connection from a device to a wireless base station **consumes base station resources** for a period of time and in some cases can also consume **other network resources** . . . . If a device terminates the connection to the base station when the modem subsystem (e.g., or some other portion of the device) goes from active connection state to a power save state, then each time the device enters power save state and then exits power save state **network resources are consumed** . . . . Another similar example is the establishment of network sessions once the base station connection is established . . . , in which **network resources** required to open and/or close the network session **are ignorantly consumed** if a device exhibits aggressive power save state cycling or frequently terminates the data session for other reasons.

'076 Patent at 7:46–8:3 (emphases added).

Plaintiff's other citation provides no support either. Opp. 2–3 (citing '076 Patent at 8:36–37); '076 Patent at 8:23–40 ("[T]he types of service activities and/or device behavior that can reduce **network capacity** and/or **network resource availability** include . . . inefficient network access sequences during frequent power cycling or power save state cycling . . . ." (emphases added)).

Because "**power consumption** of the wireless device itself," Opp. 2, is not a problem the '076 Patent purports to solve, it is irrelevant to the § 101 analysis. *See, e.g.*, *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020) ("The Step 1 'directed to' analysis . . . depends on an accurate characterization of what the claims require and of what the patent asserts to be the claimed advance. The accuracy of those characterizations is crucial to the sound conduct of the inquiries into the problem being addressed and whether the line of specificity of solution has been crossed.").

### 3. '700 Patent: The Claims Are Not Directed to Preventing Wasteful Access

Plaintiff's opposition also contends for the first time that claim 1 of the '700 Patent "addresses the problem of certain types of 'device service activity' that substantially drain network capacity/performance." Opp. 20. But claim 1 is too generic to solve this problem: it encompasses *any* "applications" being classified for scheduling simply "*according to*" *any* "network access policy controls." Indeed, the '700 Patent envisions that classification could be based on any number of things, including, "e.g., network type, time of day, connection cost, whether home or roaming, network busy state, QoS, and whether the particular service usage activity is in foreground of user interaction or in the background of user interaction, or other characteristics that are obtained . . . through other means." '700 Patent at 103:37–45; *see also id.* at 103:45–54 (listing still other things "[c]lassification rules can include"). Merely scheduling "*according to*" these *numerous* "network access policy controls" lacks the specificity needed to solve the problem of "substantially drain[ing] network capacity" that Plaintiff identifies. *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1346–47 (Fed. Cir. 2021) ("[P]atent eligibility often turns on whether the claims provide sufficient specificity to constitute an improvement to computer functionality itself."), *cert denied*, 142 S. Ct. 2707 (2022). Without more, the claims of '700 Patent (and the '076 Patent as well) raise the precise sort of "preemption concern that undergirds 35 U.S.C.S. § 101 jurisprudence." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

### B. The '076 Patent Is Ineligible Under 35 U.S.C. § 101

#### 1. *Alice* Step One: Claim 1 Is Directed to an Abstract Idea

Claim 1 of the '076 Patent is directed to screening a request through two steps: classifying it based on whether a user is interacting with the requesting application—an indication of whether the request is higher priority or lower priority—then screening it based on that classification and a "power control state"—an indication of whether the request is likely to lead to repeated requests. Opening Br. 7-11. These same two steps are routinely performed by humans in gatekeeper functions. Just one example is the executive assistant described in Defendants' opening brief who, first, classifies whether a person's request for an executive's time is higher priority, then, second, passes along or screens the request based on the classification and how likely it is to lead to repeated

requests. *Id.* Looking past the "technical jargon" of the claim, as the Federal Circuit did in *Ericsson*, claim 1 recites the "bare abstract idea" of "controlling access to resources by receiving a request and determining if the request for access should be granted," a process the executive assistant has long performed. 955 F.3d at 1325–27.

Plaintiff is unable to distinguish *Ericsson*. Opp. 13–14. According to Plaintiff, while "the *Ericsson* claim says nothing about the factors, if any, used to decide whether and when access is denied," claim 1 here includes "decision logic." *Id.* (citing *Ericsson*, 955 F.3d at 1325–26). But *Ericsson* also addressed a claim, claim 5, that included what Plaintiff characterizes as "decision logic": a "security access manager" that "determines ***if*** the request should be granted ***based on*** *an identification stored in the record.*" *Ericsson*, 955 F.3d at 1326 (emphases added). This decision logic is no different than what Plaintiff has claimed here. The court found this claim, too, was "directed to the abstract idea of controlling access to, or limiting permission to, resources." *Id*. Therefore, a side-by-side comparison of the claims in *Ericsson* and the claims here only further confirms their abstractness.

Additionally, numerous claims reciting decision logic have been deemed abstract. As just one example, the claim in *PersonalWeb* recited a "computer-implemented method" that determined, "in response to [a] request . . . whether or not access to [a] particular data item is unauthorized." 8 F.4th at 1313. Like claim 1 here, the claim recited decision logic: The request included a "content-dependent name . . . based, at least in part, on at least a function of the data in the particular data item," such as a "message digest function or a hash." *Id.* The "determining," the claim required, was done "based on whether the content-dependent name . . . correspond[ed] to at least one of [a] plurality of values." *Id.* And, "based on said determining," the method required "not allowing the particular data item to be provided to or accessed by [a] second computer if it is determined that access . . . is not authorized." *Id.* Yet, as in *Ericsson*, the claim was deemed abstract. As the court explained, "the claims are directed to the use of an algorithm-generated content-based identifier to . . . control[] access to data items." *Id.* at 1316. This decision logic did not render the claim eligible because it was, at root, the same as that employed in libraries: "Librarians often locate books based on a 'call system' where they assign books unique identifiers based on call numbers" and "[s]uch

content-based identifiers may be used to control access to books." *Id.* In *PersonalWeb*, as here, the claims employ the decision logic "in a computer environment, but that doesn't transfigure an idea out of the realm of abstraction." *Id.* (quoting *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) ("An abstract idea on 'an Internet computer network' . . . is still an abstract idea.")).

Finally, Plaintiff's contention that the "wireless end-user mobile device" in claim 1 is a meaningful distinction of *Ericsson* overlooks that "limit[ing] the [claim] to [this] particular environment . . . does not make the claims any less abstract for the step 1 analysis." *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016). Defendants devoted over a page of their Opening Brief showing how the claims in *TLI*, which were drawn to the abstract idea of "classifying an image and" taking action "based on its classification," are much like the "classify[ing]" and "allow[ing] or disallow[ing]" in the claim here. Opening Br. 13, 14. Plaintiff never mentions *TLI*, let alone explain why the Federal Circuit's reasoning there is inapplicable here.

Plaintiff also wrongly charges that Defendants have "over-simplif[ied] the claims" by "ignoring all the claim elements." Opp. 11 (emphasis removed). Defendants' opening brief addressed every element of claim 1 both individually and as an ordered combination, even providing a chart. Opening Br. 10-11. Rather than grapple with these facts, Plaintiff caricatures Defendants' argument as simply reducing the "over two hundred words in the claim" to "a two-word phrase ***not*** in the claim"—something Plaintiff contends "show[s] the motion should be denied." Opp. 10–11. First, there is nothing improper about characterizing a claim (whatever its word count) as its abstract idea. *Alice* itself reduced a 194-word claim to the abstract idea of "intermediated settlement." *Alice*, 573 U.S. at 213 n.2, 218. There is also no "requirement of . . . using *some* claim language," as Plaintiff asserts. Opp. 11. "[I]ntermediated settlement" did not appear anywhere in the *Alice* claim. *Alice*, 573 U.S. at 213 n.2. Neither the Supreme Court nor the Federal Circuit has ever required the abstract idea appear *verbatim* in the claim, as Plaintiff's lack of supporting case law reveals.[1]

---

[1] Plaintiff's demands that the abstract idea "describe the *field of invention*" or "compare to the *title* of the '076 patent" (Opp. 11) are also unsupported by case law.

Plaintiff also accuses Defendants of "violat[ing] controlling law by omitting the claimed advance in their Step One analysis." Opp. 8, 11 (citing *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 347–49 (Fed. Cir. 2018)). But, as *Ancora* itself recognized, the "claimed advance" is simply another way of stating the Step One "inquiry" that asks "whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Ancora*, 908 F.3d at 1347 (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)). Defendants addressed this inquiry head on, explaining (with a similar quote from *Enfish*) why "nothing in the asserted patents suggests any 'improvement in the functioning of a computer.'" Opening Br. 15–16 (citation omitted). Moreover, Defendants' opening brief detailed the very "network capacity crunch" that Plaintiff now identifies as the problem purportedly solved by the '076 Patent, even citing many of the same passages that Plaintiff cites. *Compare id.* at 4–5 (citing '076 Patent at 3:28–37, 4:6–21, 7:42–57, 11:15–37, 11:46–49), *with* Opp. 2-4 (citing '076 Patent at 3:28–4:21, 7:42–45, 11:15–12:27). Plaintiff may disagree with Defendants' analysis on this inquiry, but it has not been "ignore[d]." Opp. 11.

### a. The claimed process is the sort that can be performed in the human mind

In addressing Defendants' executive assistant analogy, Plaintiff charges that "no human mind can selectively block WWAN Internet access requests" according to the criteria in the claims. Opp. 12. Plaintiff claims that "a human mind is *incapable* of doing these things, at least because users do not even know these network requests are occurring in the background and have no way to detect them." *Id.*; *see also* Opp. 17 (similar).

Plaintiff misunderstands Defendants' argument and, more importantly, Federal Circuit precedent on this point. The Federal Circuit has found that claims "can be performed *entirely* in the human mind" even where the claim recites computer-based requests. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372-73 (Fed. Cir. 2011). In *Ericsson*, for example, the court found that the claimed process was "exactly the sort of process that 'can be performed in the human mind,'" notwithstanding that the claim recited steps like "receiving a request *from [a] requesting*

*application domain software*" and "grant[ing] access to [a] software services component *via*" an "*interface* . . . for enabling application domain software to be installed, loaded, and run." *Ericsson*, 955 F.3d at 1325–27 (emphases added) (quoting *CyberSource*, 654 F.3d at 1372). The claim in *PersonalWeb* was likewise deemed a "mental process[] that 'can be performed in the human mind,'" even though it recited "receiving *at a first computer from a second computer*, a request regarding a particular data item." 8 F.4th at 1313, 1316.

  *SRI* did not, as Plaintiff suggests, hold otherwise. Opp. 12 (citing *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295 (Fed. Cir. 2019)). In *SRI*, the Federal Circuit held that claims reciting a "computer-automated method of hierarchical event monitoring and analysis within an enterprise network" were patent eligible because they were "directed to using a specific technique—using a plurality of network monitors that each analyze specific types of data on the network and integrating reports from the monitors—to . . . identify[] hackers or potential intruders into the network." 930 F.3d at 1301, 1303. But the court never said (as Plaintiff suggests) that "network connection requests" and "network connection denials" are "not the type of human activity that § 101 is meant to exclude." Opp. 12 (quoting *SRI*, 930 F.3d at 1301, 1304). Rather, the court was referring to using traffic data to "detect suspicious activity by using network monitors and analyzing network packets." *SRI*, 930 F.3d at 1304. Indeed, the claimed "network connection requests" and "network connection denials" are mentioned nowhere in the court's § 101 analysis.

  Plaintiff stretches the reasoning of *SRI* to argue that *any* claim reciting computer network requests or denials (which is *many* computer networking claims) should be patent eligible as a matter of law because the human mind cannot literally perform data communication functions like the "allow[ing] or disallow[ing] [of] the Internet access request" in claim 1. Opp. 12. That is not the standard. As cases like *Ericsson* and *PersonalWeb* (both decided after *SRI*) make clear, claims reciting data communication features can be ineligible, even where specific features like transmitting network signals and data packets cannot literally be performed by a human mind. *Ericsson*, 955 F.3d at 1325–27; *PersonalWeb*, 8 F.4th at 1316; *see also RingCentral, Inc. v. Dialpad, Inc.*, 372 F. Supp. 3d 988, 996–97 (N.D. Cal. 2019) (Tigar, J.) (finding, for a claim reciting "receiv[ing]" and

"send[ing] [a] message over the Internet," that "there is nothing in the claims themselves that foreclose them from being performed by a human, mentally").

### b. The cases Plaintiff cites involved problems unique to computers

Plaintiff seeks to liken claim 1 to the claims found patent eligible in *Packet Intelligence*, *Core Wireless*, *Droplets*, and *Koninklijke*. Opp. 9–10. But each of these cases involved claims that solved a problem that, far from having a real-world analogy, was unique to computers.

In *Packet Intelligence*, the Federal Circuit held that a claim reciting "[a] packet monitor for examining packets passing through a connection point on a computer network" was not directed to an abstract idea. 965 F.3d 1299, 1304 (Fed. Cir. 2020). But this was not simply because it involved the "classification of network traffic." Opp. 21 (quoting 965 F.3d at 1310) (emphasis removed). Rather, at Step One, the Court explained the problem the claim addressed: "[T]o measure the amount or type of information being transmitted by a particular application . . . , a network monitor must measure '*all* of the connection flows through which that application . . . transmits packets,'" also known as the application's "conversational flow." *Id.* at 1303, 1307. But "prior art monitors could not identify disjointed connection flows as belonging to the same conversational flow." *Id.* at 1307. This problem—"relating disjointed connection flows to each other" to identify conversational flows for measurement—was, the court concluded, a "discrete technical problem'" that was "unique to computer networks." *Id.* at 1308–1309.

*Core Wireless* and *Droplets* likewise considered problems arising only in computers. Opp. 10 (citing *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1359–63 (Fed. Cir. 2018); *Droplets, Inc. v. Yahoo Inc.*, No. 4:12-cv-03733-JST, Dkt. No. 1165, at 4 (N.D. Cal. Aug. 25, 2022)). In *Core Wireless*, the patent recognized that devices with "small screens" required "data and functionality [to be] divided into many layers or views," such that a user had "to scroll around and switch views many times to find the right data/functionality." 880 F.3d at 1363. The court emphasized that, with these small screen devices, users had "to drill down through many layers to get to [the] desired data or functionality," sometimes "[p]aging through multiple screens of options." *Id.* Similarly, in *Droplets*, the patent addressed "the problem of retaining information entered into a website that . . . would lose that information once the user left the original site for another website

1  and re-navigated back to the original site." No. 4:12-cv-03733-JST, Dkt. No. 1165, at 5. And the

2  "error checking in data transmissions" at issue in *Koninklijke* was so clearly a technological

3  improvement that even the patent challengers admitted it. Opp. 10; *Koninklijke KPN N.V. v Gemalto*

4  *M2M GmbH*, 942 F.3d 1143, 1150–51 (Fed. Cir. 2019). As in *Packet Intelligence*, the *Core Wireless*

5  problem (navigating layered screens to access desired data or functionality), the *Droplets* problem

6  (retaining information entered into a website when the user navigates away), and the *Koninklijke*

7  problem (error checking in data) are problems that arise exclusively in computers.

8        Claim 1 here is different. The problem it addresses—in Plaintiff's words, "wasteful signaling

9  causing . . . wireless network congestion," Opp. 12[2]—is analogous to any situation in which

10  numerous requests ("wasteful signaling") for a resource lead to "congestion." There is no new,

11  "unique," or "discrete technical" problem that arises when the resource at issue is the network.

12        Plaintiff quotes that it "is not enough . . . to merely trace the invention to some real-world

13  analogy." *Id.* (quoting *Data Engine Techs. LLC v. Google, LLC*, 906 F.3d 999, 1011 (Fed. Cir.

14  2018)). But analogies are regularly employed by courts to ascertain "whether the claim is 'directed

15  to' the abstract idea itself," or whether there is a "technological problem in computers" that the claim

16  solves "in a particular way." *Data Engine*, 906 F.3d at 1008, 1011; *see, e.g.*, *Intell. Ventures I LLC v.*

17  *Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) ("We . . . think the district court's analogy to

18  a corporate mailroom is also useful."); *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326

19  (Fed. Cir. 2017) (analogizing the claimed use of "assign[ed] image codes" to "Morse code, ordering

20  food at a fast food restaurant via a numbering system, and Paul Revere's 'one if by land, two if by

21  sea' signaling system"). In *RingCentral*, for instance, this Court "analogize[d] the claimed system to

22  a corporate mailroom" to show that a claimed "private branch exchange (PBX) system" performed

23  the very same message management functions as a person "referencing a department roster." 372 F.

24  Supp. 3d at 996–97 (Tigar, J.). By contrast, what made the claims in *Data Engine* patent eligible was

25  the very same thing that made the analogy asserted there inapt: the claims recited "specific structures

26  within [a] three-dimensional spreadsheet environment"—something "unique to computers" that had

---

[2] Plaintiff also contends such signaling "cause[s] device-battery drainage," Opp. 12 (emphasis removed), but this has no support in the Patents, as explained *supra* in Section II.A.2.

no analogue in the real-world "tabbed notebooks" of the asserted analogy. 906 F.3d at 1009, 1011.[3] Here, Defendant's executive assistant analogy is on point precisely because the "network congestion" problem that claim 1 purports to solve is not, in fact, unique to computers. It is a problem that occurs whenever there is demand to access a limited resource.

### 2. *Alice* Step Two: Claim 1 Includes No Inventive Concept

#### a. Conventional processors could "classify" applications and "allow" or "disallow" requests for Internet access

According to Plaintiff, the purportedly "unconventional solution" of the '076 Patent—"controlling network service usage activities at . . . the device"—is reflected in "the 'processor' term." Opp. 14–16. But the intrinsic evidence shows otherwise. Opening Br. 16–17.

The '076 Patent itself admits that the claimed "classify[ing]," "allow[ing]," and "disallow[ing]" can be implemented with "a conventional microprocessor such as an Intel Pentium microprocessor or Motorola power PC microprocessor." '076 Patent at 99:33–35. And "[t]he specification fails to provide any technical details" for how this "classify[ing]," "allow[ing]," and "disallow[ing]" are unconventional. *TLI*, 823 F.3d at 612. Rather, "classify[ing] whether" the requesting application "is interacting with the user in the device user interface foreground," as claim 1 recites, is listed, without further explanation, alongside numerous generic techniques for "categoriz[ing]," from those "based on, e.g., network type, time of day, . . . [or] QoS" to those based on any "other characteristics that are obtained from network service usage analysis or through other means." '076 Patent at 101:16–27. That is, the '076 Patent treats the claimed "classify[ing]" as interchangeable with numerous classifications Plaintiff does not contend are unconventional—including classification based on "QoS," which is synonymous with the classification based on "service classes" that Plaintiff admits conventional wireless end-user devices could do. Opp. 16 (stating cited passage describing what, "[t]raditionally, mobile devices" could do "is . . . classify[] network service usage into 'one or more service classes'" (quoting '076 Patent at 4:22–28, 97:32–34)); *see also, e.g.*, '076 Patent at 19:62, 20:66, 24:56–66 ("QoS service class[es]").

---

[3] Notably, the single claim in *Data Engine* that was "not limited to [this] specific technical solution and improvement in electronic spreadsheet functionality" was deemed abstract. *Id.* at 1012.

Plaintiff touts that the examiner found the prior art of record did not disclose "classify[ing] whether" the application "is interacting with the user in the device user interface foreground" or "disallow[ing]" requests based in part on this determination. Opp. 9, 16 (citing Ex. A at 6). To the extent the examiner's mere mention of this claim element alongside others is sufficient to show the claimed "processor" is novel, purported novelty cannot save an abstract claim. "[A] claim for a *new* abstract idea is still an abstract idea." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016); *see also Quad City Pat., LLC v. Zoosk, Inc.*, 498 F. Supp. 3d 1178, 1187 (N.D. Cal. 2020) (Tigar, J.) (an argument that "during prosecution, the examiner found that the prior art did not teach" something in the claim "confuses the analyses required under Section 101 versus Sections 102 and 103: novelty does not render an abstract idea patent eligible").

The claimed "allow[ing]" and "disallow[ing]" is likewise treated conventionally. Plaintiff suggests the "block/allow" function is unconventional, Opp. 16, but this function is repeatedly listed alongside numerous well-known traffic techniques that may be used for "implementation of a network service usage activity policy." *See, e.g.*, '076 Patent at 13:21–25 ("implementation of a network service usage activity policy (e.g., block/allow; traffic control techniques, such as throttle, delay, . . . and other well known traffic control techniques")[4]), 55:58–62 ("allow, block, throttle, and/or queue priority (e.g., and/or otherwise control using various traffic control related techniques)"). An inventive concept cannot be found in features that are "described and claimed generically rather than with the specificity necessary to show how those components provide a concrete solution to the problem addressed by the patent." *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016).

        **b.**       **This case is distinguishable from *BASCOM***

Plaintiff claims that "the ordered combination of elements" in claim 1 includes "an inventive concept," as in *BASCOM*. Opp. 18 (citing 827 F.3d 1341 (Fed. Cir. 2016)). Certainly, as in *BASCOM*, "the limitations of the claim[], taken individually, recite generic computer, network and

---

[4] Plaintiff contends—presumably on the basis of the semicolon—that this quote in fact "***distinguishes*** 'block/allow' from . . . 'well known traffic control techniques,'" but fails to explain what that distinction actually is. Opp. 17. Its citations to the 076 Patent do not reveal any.

1   Internet components, none of which is inventive by itself." 827 F.3d at 1349. But the similarity ends
2   there. *BASCOM* distinguished between "a technology-based solution . . . that overcomes existing
3   problems with other" technologies—which is eligible—and "an abstract-idea based solution
4   implemented with generic technical components in a conventional way"—which is not. *Id.* at 1351.
5   The *BASCOM* claim was the former: it recited a "specific location" of a "filtering tool" that allowed
6   that filtering tool to do something it could not do before—achieve the benefits of being located at the
7   ISP server yet "retain[] the advantage of a filtering tool that is located on each local computer." *Id.* at
8   1344, 1350. Claim 1 here is the latter: it uses generic components to carry out a well-known
9   technique (classifying, then allowing or disallowing based on that classification) for controlling
10  access to a resource.
11       Plaintiff contends that "one inventive concept here was to move network service control
12  functionality from the centralized/core network (the server) to the wireless user device (the client),"
13  just as "[t]he inventive concept in *BASCOM* was to move filtering functionality from the client to the
14  server." Opp. 18. But moving a functionality from a server to the client (as in the '076 Patent) or
15  vice versa (as in *BASCOM*) is not itself an inventive concept—and *BASCOM* did not say it was.
16  Rather, *BASCOM* makes clear that "another prior art system relocated the filter to a local server," yet
17  did not achieve these same advantages. *BASCOM*, 827 F.3d at 1344. Rather, the inventive concept in
18  *BASCOM* was "the installation of a filtering tool at a specific location, remote from the end-users,
19  *with customizable filtering features specific to each end user*," instead of the "one-size-fits-all
20  scheme" of the prior art. *Id.* at 1344, 1350. This was made possible by a "log-in process," reflected
21  in the claim by the ISP's "associating [of] each said network account to" its own "filtering scheme."
22  *Id.* at 1344–5, 1350. There is nothing similar in claim 1, which does no more than move
23  functionality from one device to another.

24       **C.   The '700 Patent Is Ineligible Under 35 U.S.C. § 101**

25            **1.   *Alice* Step One: Claim 1 Is Directed to an Abstract Idea**

26       As Plaintiff admits, the '700 Patent is "similar" to the '076 Patent. Opp. 1, 5. Claim 1 of the
27  '700 Patent is directed to assisting with scheduling activities according to rules by (1) associating
28  rules with applications, (2) receiving requests from the applications to schedule activities, and

1  (3) scheduling activities for each application according to the rules associated with that application.
2  These same steps are routinely performed by humans, like executive assistants, to schedule activities
3  according to rules—an abstract idea. Like the claims this Court held abstract in *24/7 Customer, Inc.*
4  *v. LivePerson, Inc.*, claim 1 "do[es] not provide for any specific implementation of this abstract
5  idea" by, e.g., "specify[ing] the structure or content" of those policies, "or even how the [policies]
6  should be analyzed to achieve the proposed solution." No. 15-cv-02897-JST, 2017 U.S. Dist. LEXIS
7  81479, at *10 (N.D. Cal. May 25, 2017) (Tigar, J.). Instead, the claims provide "a generalized
8  solution in [the] broad, functional language" of an "activity classifier"[5] and "launch manager," *id.* at
9  *10–11, that do nothing more than classify and schedule "according to" the "policy controls."
10         Plaintiff's only attempt to explain why this Court's analysis in *24/7* (and *RingCentral*) does
11  not apply here is an assertion that "[t]hose claims provided no known technical improvement to
12  computer technology." Opp. 23. According to Plaintiff, claim 1, like those found eligible in *Packet*
13  *Intelligence* and *Koninklijke*, recites a technological solution to a technological problem. Opp. 21
14  (citing *Packet Intel.*, 965 F.3d at 1310; *Koninklijke*, 942 F.3d at 1150). Not so. Even the problem
15  Plaintiff claims is solved—"*wasteful access by certain activities and applications and overloading*
16  *the wireless network*"—is not unique to computer networks. Opp. 22. Rather, as Defendants'
17  executive assistant example illustrated, this wasteful access and overloading are problems that occur
18  whenever *any* type of resources are accessed.

19         **2.     *Alice* Step Two: The Claims Include No Inventive Concept**

20         Claim 1 of the '700 Patent also lacks an inventive concept. Plaintiff cites *BASCOM* to allege
21  two "inventive concepts" in claim 1: "controlling network service usage *on the wireless device itself*,
22  as opposed to 'centralized' control mechanisms located on the network," and "controlling network
23  service usage **at the application level**." Opp. 23–24 (citing 827 F.3d at 1350). However the inventive

---

[5] Plaintiff's footnoted attempt to conjure a claim construction dispute does not prevent resolution of eligibility at this stage. "[T]here are no such disputes to resolve, given that [Plaintiff] does not identify any proposed construction or explain how claim construction would change the Court's analysis." *Quad City*, 498 F. Supp. at 1187; *see Sneed v. Procter & Gamble Co.*, No. 23-cv-05443, 2024 U.S. Dist. LEXIS 41234, at *1 (N.D. Cal. Mar. 8, 2024) (Tigar, J.) ("'Arguments raised only in footnotes, or only on reply, are generally deemed waived' and need not be considered.") (citation omitted).

concept in *BASCOM* was not simply moving the functionality, but rather enabling the server to do something it previously could not do ("*customizable filtering features specific to each end user*"). *BASCOM*, 827 F.3d at 1344, 1350. Claim 1, with its generic "applications" and "network access policy controls," is not limited to anything prior art devices could not do. The '700 Patent's generic treatment of applications, network access policy controls, and APIs confirm this. *See, e.g.*, '700 Patent at 74:64–76:5 (various APIs, including "open API or standard/required API"), 103:34–54 (various policy controls), Fig. 23 (various applications).

### D. The Dependent Claims of the '076 and '700 Patents Are Likewise Ineligible

Plaintiff accuses Defendants of making "bare assertion[s]" regarding the dependent claims of both Patents. Opp. 19–20, 25. But Plaintiff likewise barely addressed them, merely parroting the claim language and asserting, without explanation, that these requirements are "material to patent-eligibility." *Id.* They are not. Rather, these claims recite generic components and "simply provide further narrowing" of the abstract idea that "add nothing outside the abstract realm" *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1169 (Fed. Cir. 2018); Opening Br. 18–19, 24.

### III. CONCLUSION

Plaintiff states in a single conclusory sentence that "Headwater should be given leave to amend its pleadings," obliquely citing *Aatrix*. Opp. 25 (citing *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126 (Fed. Cir. 2018)). But Plaintiff fails to explain why an amendment would not be futile. In *Aatrix*, there were factual disputes over how the patents at issue solved a technical problem. 882 F.3d at 1126. Here, the very problem Plaintiff alleges the '076 and '700 Patents solve—even if taken as factually true—is solved using solutions ("schedul[ing] . . . according to . . . [a] policy" or "allow[ing] or disallow[ing] . . . request[s]" based on criteria) routinely used in other contexts where resources are demanded. Amendment here would be futile. The motion to dismiss should be granted without leave to amend.

Dated: April 2, 2024

FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP

By: */s/ Daniel C. Cooley*
    Daniel C. Cooley
    *Attorney for Defendants*
    *Motorola Mobility LLC and*
    *Lenovo (United States) Inc.*